**In re the Detention of Robert E. SWANSON.**

**State of Iowa, Appellee,**

v.

**Robert E. Swanson, Appellant.**

No. 02–0579.

Supreme Court of Iowa.

Sept. 4, 2003.

Mark Smith, First Assistant Public Defender, and Melissa A. Anderson, Assistant Public Defender, for appellant.

Thomas J. Miller, Attorney General, Andrew B. Prosser and Roxann M. Ryan, Assistant Attorneys General, and Thomas J. Ferguson, County Attorney, for appellee.

CADY, Justice.

In this appeal, we consider what constitutes a "recent overt act" for purposes of determining whether an individual is a sexually violent predator. Iowa Code § 229A.2(6) (2001). More specifically, we examine the actions of this defendant to determine whether his conduct created "a reasonable apprehension of [harm of a sexually violent nature.]" *Id.* We conclude that there was sufficient evidence from which a fact finder could determine that the defendant committed a recent overt act and affirm the district court judgment and order finding the defendant is a sexually violent offender who should be confined for treatment.

## I. Background Facts and Proceedings.

Robert E. Swanson (Swanson) was living in a halfway house in Des Moines in early November 2001 after being released from prison. He went to an area business, ostensibly to apply for a job. An employee there, a young woman named Christine Eiselstein (Eiselstein), informed Swanson that applications were accepted at another location. She signed a work release form for Swanson, and he went on his way.

Later that evening, Swanson called Eiselstein on the telephone at her apartment, which happened to be across the street from his halfway house. He did not identify himself initially, although he later told her his name and made reference to their meeting earlier in the day. During the course of their brief conversation, Swanson asked her whether she was "still alone" and "wanted to be friends." He also expressed that he had hesitated to call her

because he could get in "big trouble" for doing so. After a few minutes, Eiselstein pretended to have another call and attempted to end the conversation. Before doing so, Swanson asked if he could call her again. Eiselstein said he could, but later explained that she told him this in an attempt "to get him off the phone."

Eiselstein telephoned a friend and the police after hanging-up with Swanson. The police told her that a lone call was insufficient to warrant an extensive response. However, they recorded her complaint and told her to call back if Swanson contacted her again. Late the next evening, he did. This time, Swanson called to explain that he had spoken with the manager of Eiselstein's apartment complex and he was taking steps to move into the complex. He also told her that he had written and sent her a letter. When asked what the letter said, Swanson told her that he wrote about himself and asked if she was interested in moving in with him, suggesting they could be friends "with no strings attached." Eiselstein promptly ended the call.

Eiselstein called the police once again and later met with an officer. The officer offered to make a report or to talk to Swanson about his actions toward her. Eiselstein deferred to the officer's judgment about the proper approach, and the officer later went and spoke directly to Swanson. Eiselstein then left Iowa for a brief period of time. When she returned, Swanson's letter was waiting for her. The three-page, hand-written letter stated, in part (with original punctuation and omissions signaled by * * *):

Good Evening; Neighbor ...

Since the ice was already broken a bit, earlier; I thought/felt I should at least sit down here and write a few lines; Maybe to fill in some of the gaps/holes, and; Possibly answer some questions First of all; Just Friends ...; Okay with you? (Nothing more expected; No strings attached ... ) As I said earlier; I don't need problems, trouble ... I've done a Lot of time, and; I'm tired ... (I'm soon to turn 52 in late Dec.) As I've already said; I've been thru two marriages already. * * *

I smoke ... I haven't had a drink since early 82; (With the exception of tea/soda ... ) I like jazz, classical, and easy listening music ... A nice walk in a park would be nice; Especially in this weather! Obviously; I like/don't mind work ... * * *

I am in hopes, by now ... You may feel at least a bit more comfortable ... I realize, that my call was an awkward situation, for both of us. And; I most likely, was more scared/concerned than you, making that call ... For me; It was a risk, that I had thought about, and debated with myself, for some time, before I even called ... It was a risk, and, a step toward trust that I thought I'd take ... From your side/end; It was also a risk; and trust. Which leads me to this ... Now that "trust" has begun, I will tell you now.... That I will Not disrespect, or, violate, or jeopardize that trust, now begun/established in any way, shape, or form Chris ... This, is my word, and promise to you..; Right at the very beginning ...

If you have any questions of/for me ...; I will answer them to you, with honesty, and up-front and on the table ... (No smoke and mirrors. But, what has begun between us today, I'd like to see be allowed to grow. I[t] is fragile, and precious, worth more to me than the riches [sic] fields of oil or gold throughout the world. And, I'd "like" to see it mature and grow, within the lifetime I have left.

As I went outside a few minutes ago to have/take a smoke break for a few minutes, a real dumb/stupid question came to my mind (Here's a person who's eventually going to be a "CPA"; I wonder if she's ever considered saving some money on her rent? Like halfing it..; More goes to the bank books that way ... ) *[As I said; It was just a fleeting humorous thought/question ... ]; No strings attached ... Remember ... But; Should you ever think about it..; This close neighbor, would be willing to offer. * *[Because; It actually saves two people ... And ...; Since it's only a one bedroom ...; After all I've dealt with all these years ... A nice, soft, comfortable couch, would be like heaven, to me!!] (Notice I can be humorous, and witty too?) Boy; I'll be willing to bet that, a "certain mother," would really have kittens, if that ever happened ...; Let alone; A, certain father ....

I suppose, with that ... I'd better wrap this up, for now ... Got to get up early in the morning, to try to find myself a job ... This isn't a masterpiece; But; It's at least a start ... (And; I'm glad/ pleased, that it was allowed to start....

Later Neighbor...., Bob Swanson

Eiselstein gave the letter to the police and had no further contact with Swanson. She changed her phone number and moved from her apartment. As the matter was investigated further, Swanson's actions began to take on a greater meaning.

1. The record contains no indication that Eiselstein was aware of Swanson's prior criminal history or pattern of conduct related to his sexually violent offenses.

2. One of Swanson's victims later described one of these encounters in her testimony at his trial for her assault:
    Q. Did you speak to either one of those individuals [at the laundry]? A. Yes, sir.

The investigation revealed Swanson had a long history of committing sexually violent offenses. He was charged with his first sexual offense in 1964, at the age of fourteen. In 1973, he was convicted for raping a fourteen-year-old girl. He was released from prison in 1979 and returned there in 1980 after another conviction, this time for sexual abuse in the third degree. He also allegedly assaulted another woman in 1980 who did not report the crime before the statute of limitations on the offense had run. In a letter to the governor in 1984, Swanson pleaded for additional state treatment programs for sex offenders such as him, claiming that he had raped five or six additional women between 1964 and 1973. In the same letter, he claimed he had raped at least one more woman between 1979 and 1980. Finally, while imprisoned for the second time, Swanson called or wrote several women in the Marshalltown area, apparently by randomly finding phone numbers and addresses that were listed with only a single, female name.

Based on his prior criminal record and his own admissions, Swanson had committed about ten sexually violent offenses in his lifetime. However, it was the pattern of his prior conduct that became most alarming as the investigation proceeded. On a number of times in the past, Swanson had randomly contacted single women with whom he had had little or no prior connection in an effort to befriend them.[1] Tragically, some of these women later became victims of his violent sexual assaults.[2]

One of them came over. I was crocheting waiting for my things to get done, and he commented that the colors were nice, and we talked about my crocheting.... He asked me where I was going, what I was going to do after I got done with my clothes. And I told him that I had planned to watch the television show Battle Star [sic] Galactica, that I wasn't sure if I would

On November 29, 2001, the State filed a petition in the district court seeking a determination of Swanson's status as a sexually violent predator under Iowa Code chapter 229A. *See id.* § 229A.4. At a later hearing, the district court found that probable cause existed to believe Swanson was a sexually violent predator and that he should be temporarily confined pending trial. *See id.* § 229A.5. His trial commenced in February 2002. As a procedural matter, the district court determined it would decide whether Swanson's conduct constituted a recent overt act, and the jury would decide the other issues.[3] After examining the evidence presented, the district court determined that Swanson's conduct toward Eiselstein was a recent overt act. Based on this finding, combined with the jury's additional conclusions, the district court entered a judgment that Swanson was a sexually violent predator who should be confined for treatment. Swanson appeals from the district court's judgment and order of confinement.

## II. Standards of Review.

Swanson's challenge to the district court's order is directed toward the sufficiency of the evidence underlying the court's determination that he had committed a recent overt act. We recently summarized our standard of review for issues of sufficiency of the evidence in *State v. Yeo,* 659 N.W.2d 544, 547 (Iowa 2003):

> see it. . . . And my clothes finished-up and he said, well, what are you going, you know, what are you going to do now? I realize you don't know me, but I have a color TV. If you want, like to come up to my apartment and watch the show there, he said, you know, there is no strings, no obligations. I don't want you to think I am hitting on you or anything but if you would like to.
>    Q. Did you—what did you say or do at that point? A. I said, yeah, I would like to.

Our review of challenges to the sufficiency of the evidence is for correction of errors at law. *State v. Lambert,* 612 N.W.2d 810, 813 (Iowa 2000) (citing *State v. Thomas,* 561 N.W.2d 37, 39 (Iowa 1997)). We are bound by the trial courts finding[s] [if the findings are] supported by substantial evidence upon which a "rational trier of fact could conceivably find the defendant [is a sexually violent predator] beyond a reasonable doubt." *Id.* To determine whether the evidence was substantial, we consider the entirety of the evidence presented in a "light most favorable to the State, including all legitimate inferences and presumptions which may be fairly and reasonably deduced from the record." *Id.* Evidence is not substantial if it raises only suspicion, speculation, or conjecture. *Id.*

Swanson's challenge to the order of confinement also requires us to construe portions of Iowa Code chapter 229A, the Sexually Violent Predator Act. We focus on the intent of the legislature when construing the statute, looking first and foremost to the language it chose in creating the act. *Gardin v. Long Beach Mortgage Co.,* 661 N.W.2d 193, 197 (Iowa 2003). We read the statute "as a whole and give it 'its plain and obvious meaning, a sensible and logical construction,'" which does not create an "impractical or absurd result." *Id.* (quoting *Hamilton v. City of Urbandale,* 291 N.W.2d 15, 17 (Iowa 1980)). If it is

> I asked him what his name was and he said Bob. I packed up my clothes and followed him with my car. He drove his car and I drove mine to his apartment.
>    Swanson later raped his victim at the apartment.

**3.** The decision to utilize this bifurcated procedure was not challenged on appeal. We do not address the propriety of this procedure.

necessary, "we look to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage" to aid our interpretation. *Id.* We review the district court's construction of the statute for correction of errors at law. *See State v. Mitchell,* 568 N.W.2d 493, 500 (Iowa 1997).

### III. Recent Overt Act.

The core of Iowa's Sexually Violent Predator Act is found in Iowa Code section 229A.7(3), which provides, in part:

> If the court or jury determines [beyond a reasonable doubt] that the respondent is a sexually violent predator, the respondent shall be committed to the custody of the director of the department of human services for control, care, and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large.

This determination rests on a number of statutorily defined words and criteria. The most important, for the purposes of this case, is the definition of a sexually violent predator: "a person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined." *Id.* § 229A.2(9). At trial, the statutory requirements that Swanson be convicted of a sexually violent offense and suffer from a mental abnormality did not create the same controversy as the question of whether the mental abnormality made Swanson "likely to engage in predatory acts" of sexual violence. *Id.* Under this requirement, the State had to show that Swanson, who was "not confined at the time" the petition for confinement was filed, committed a "recent overt act." *Id.* § 229A.2(3). This phrase is defined as "any act that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm." *See id.* § 229A.2(6). Ultimately, the nature of Swanson's actions toward Eiselstein caused both parties to focus on whether he had committed an act that created a "reasonable apprehension of [harm of a sexually violent nature.]" *Id.* § 229A.2(6). We, too, must focus on this question.[4]

The State argues that Swanson's contacts with Eiselstein were wholly inappropriate, and were alone enough to make her apprehensive of "harm of a sexually violent nature," triggering the provisions of the Sexually Violent Predator Act. *Id.* The State augments this argument with the evidence of Swanson's prior pattern of conduct, noting that any initial uncertainty about his current actions was dispelled by knowledge of his prior actions.

Swanson argues that his prior conduct is largely irrelevant because the sole focus of the inquiry must be on his state of mind and the victim's "reasonable apprehension of [harm of a sexually violent nature.]" *Id.* Under this approach, Swanson asserts that, absent any knowledge of his past history, it is improbable that any apprehension Eiselstein may have experienced

---

4. Both parties presented arguments on the issue of whether the finding of a recent overt act was mandated by constitutional due process guarantees. Ultimately, the district court considered the nature of Swanson's actions and accorded him the process provided for by Iowa Code chapter 229A. *See* Iowa Code §§ 229A.1–.16 (2001). As part of that analysis, the court also considered whether a recent overt act had transpired. Although we reserve for another day any other questions that might arise related to due process and chapter 229A, we conclude that the district court's determination that Swanson had committed a recent overt act makes it unnecessary for us to further consider any due process ramifications in this appeal.

included "harm of a sexually violent nature." *Id.* He argues that, without additional evidence, any conclusions relating to his intentions toward Eiselstein would be mere speculation. He also asserts that Eiselstein effectively welcomed his contact when she told him that he could call her back at the end of their first conversation. He believes that each of these factors undercut any finding of actual apprehensiveness on Eiselstein's part, making the evidence in the case insufficient to support a finding beyond a reasonable doubt that he is a sexually violent predator.

In sorting through these arguments, we first observe that the Sexually Violent Predator Act includes an explicit statement of legislative findings. *Id.* § 229A.1. These findings reveal the legislature's intent in creating the act: to ensure public safety and to provide "treatment of the committed individual rather than punishment."[5] *In re Detention of Garren,* 620 N.W.2d 275, 280 (Iowa 2000). This legislative intent guides our resolution of the issues presented. *See Gardin,* 661 N.W.2d at 197. It also leads us to conclude that the district court was correct in determining Swanson had committed a recent overt act that created a "reasonable apprehension of [harm of a sexually violent nature.]" Iowa Code § 229A.2(6).

Both the public safety and treatment considerations behind the act indicate that the general purpose of the statute is preventative. By its creation, the legislature sought to protect the public from a "small but extremely dangerous group of sexually violent predators" by "address[ing] the

risk these sexually violent predators pose to society." *Id.* § 229A.1. This protection is to be achieved by civil commitment "for the long term care and treatment of the sexually violent predator." *Id.* In light of the goals and purpose of the statute, we do not believe our legislature sought to establish a standard that requires the victim of the overt act to subjectively experience apprehension of harm of a sexually violent nature. Such a standard would not advance the goals of the statute and would be inconsistent with the statutory language.

When a person is not already confined, the statute takes the approach that the person subject to the proceedings must have committed a recent act that "caused harm of a sexually violent nature or creates a reasonable apprehension of such harm." *Id.* § 229A.2(6). This language does not address the subjective apprehension of a potential victim alone, but targets an objective assessment based on all the surrounding circumstances. Without putting the act of a person in context, the purpose of the statute would not be served because it would fail to protect unsuspecting victims. Consequently, the public as a whole would not be protected. Instead, the subjective reaction of a victim to the acts of an alleged sexually violent predator is only a consideration. We now turn to the evidence by first considering the acts Swanson directed towards Eiselstein.

Swanson argues that the acts of calling Eiselstein on the telephone and sending a letter constituted innocent discourse, and he did not express or harbor

---

5. As the State points out, the legislature recently amended the Sexually Violent Predator Act, adding findings relevant to its intent. *See* 2002 Iowa Acts ch. 1139, § 1 (effective April 30, 2002). Of course, " 'statutes controlling appeals are those that were in effect at the time the judgment or order appealed from was rendered.' " *Wal–Mart Stores, Inc. v. Ca-*

*selman,* 657 N.W.2d 493, 498 (Iowa 2003) (citation omitted). The new findings postdate the district court's judgment and order of confinement in Swanson's case, which was entered on March 5, 2002. Thus, while we note the statute's amendment, we do not rely on it in reaching our conclusions in this appeal.

any sexually violent conduct. Yet, placed in context, the acts engaged in by Swanson clearly created a "reasonable apprehension of [harm of a sexually violent nature]" to a reasonable person. *Id.* The circumstances known to Eiselstein—that a virtual stranger, much older than her and who had recently been released from prison, was contacting her, asking whether she wanted to be "friends" and to move in together in her one-bedroom apartment—were clearly enough to justify concerns for her safety. Yet, Swanson's prior conduct, which may have been unknown to Eiselstein but was known to the State, supported a reasonable apprehension that Swanson was targeting Eiselstein like he had targeted other women before her. We think the Sexually Violent Predator Act was designed to include convicted sex offenders who target victims in such a manner. Thus, the State moved forward with commitment proceedings to protect the public—particularly Eiselstein—and to force Swanson into a treatment program on the belief that he had "antisocial personality features" that made him "unamenble to existing mental illness treatment modalities" and rendered him "likely to engage in sexually violent behavior." *Id.* § 229A.1. Swanson's view of the statute would negate this protective, preemptive effect of the act, ignore its purpose, and render it impractical. We refuse to accept his approach.

## IV.  Conclusion.

We agree with the district court's conclusion that Swanson's menacing conduct toward Eiselstein created a "reasonable apprehension of [harm of a sexually violent nature]." *Id.* § 229A.2(6). Swanson committed a recent overt act that—together with other factors found by the jury and unchallenged on appeal—showed beyond a reasonable doubt that he was a sexually violent predator who should be civilly con-

fined for treatment. *See id.* § 229A.7(3). We affirm the district court's judgment and order confining him for that treatment.

**AFFIRMED.**