# IN THE COURT OF APPEALS OF IOWA

————————————

No. 24-2006
Filed April 1, 2026

————————————

**In re Detention of Dylan Larence Sanders,**

**Dylan Larence Sanders,**
Respondent–Appellant.

————————————

Appeal from Iowa District Court for Pottawattamie County,
The Honorable Craig M. Dreismeier, Judge.

————————————

**AFFIRMED**

————————————

Wendy S. Samuelson, Assistant State Public Defender,
Special Defense Unit, Des Moines, attorney for appellant.

Brenna Bird, Attorney General, Anagha Dixit (until withdrawal) and
Nicholas E. Siefert, Assistant Attorneys General, attorneys for appellee.

————————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Badding, J.

**BADDING, Judge.**

When explaining why he committed a sexually violent offense against a twelve-year-old girl, Dylan Sanders said, "At the time I just wanted to do what I wanted to do." Sanders was diagnosed by two licensed psychologists with impulse control and conduct disorder. Although the psychologists agreed on Sanders' diagnosis, they disagreed on whether he met the criteria for commitment as a sexually violent predator under Iowa Code chapter 229A (2023). Faced with these conflicting opinions, the district court found the State's expert was more convincing and granted the committal petition.

On appeal from that judgment, Sanders challenges the sufficiency of the evidence supporting the district court's determination that he is a sexually violent predator. Deferring to the court's choice between the competing expert opinions, we affirm.

## I.     Background Facts and Proceedings

In the fall of 2017—over the course of one week—Sanders had sexual contact with three female minors: R.B., C.H., and S.B. Two of the children were eleven years old; the other was twelve. Sanders was twenty-one. He was convicted of third-degree sexual assault on a child for an offense that occurred in Nebraska and two counts of lascivious acts with a child for the offenses in Iowa. Sanders was sentenced to prison in 2019.

While serving that sentence, Sanders had five to ten sexual partners and engaged in at least twenty consensual sexual encounters with them. He was disciplined for several of these encounters because the prison prohibited sexual contact between inmates. Sanders also had a substantiated complaint under the Prison Rape Elimination Act for "sexually licking his lips" toward another inmate and telling him, "I'll knock you out and suck you off."

2

Sanders' first attempt at sex offender treatment was in November 2021. He was removed from the program three months later after he had his cellmate touch his genitals. He restarted the program in August 2022 and completed it in January 2023. During the treatment, Sanders disclosed a sexual history dating back to when he was ten years old and continuing through his incarceration at age twenty-one that included sexual activity with animals and other minor victims—male and female.

In December 2023, as Sanders' discharge date approached, the State filed a petition to have him confined as a sexually violent predator under Iowa Code chapter 229A. At a bench trial the next year, each side presented evidence from licensed psychologists with experience in evaluating sexually violent predators. The State called Dr. William Schmitt, while Sanders called Dr. Luis Rosell. Dr. Schmitt diagnosed Sanders with "other specified disruptive, impulse-control, and conduct disorder," which is characterized by "problems in the self-control of emotions and behaviors." Dr. Rosell agreed with that diagnosis. But from there, the experts parted ways. Dr. Schmitt testified that Sanders had a mental abnormality that made him "more likely than not to commit a sexual violence in the future." Dr. Rosell disagreed, focusing on Sanders' more recent behavior and response to sex offender treatment. He also challenged Dr. Schmitt's risk assessment methodology.

After considering all the evidence, the district court agreed with Dr. Schmitt's opinion and found the State had proven beyond a reasonable doubt that Sanders was a sexually violent predator. The court granted the State's petition and ordered Sanders to be committed under Iowa Code section 229A.7(5)(b). Sanders appeals, challenging the sufficiency of the evidence supporting that decision.

## II.    Standard of Review

We review challenges to the sufficiency of the evidence for the correction of errors at law.  *In re Det. of Swanson*, 668 N.W.2d 570, 574 (Iowa 2003).  The district court's findings are binding on us if they

> are supported by substantial evidence upon which a "rational trier of fact could conceivably find the defendant is a sexually violent predator beyond a reasonable doubt."  To determine whether the evidence was substantial, we consider the entirety of the evidence presented in a "light most favorable to the State, including all legitimate inferences and presumptions which may be fairly and reasonably deduced from the record."  Evidence is not substantial if it raises only suspicion, speculation, or conjecture.

*Id.* (cleaned up).

## III.    Analysis

To succeed on its petition to civilly commit Sanders, the State was required to prove beyond a reasonable doubt that he is a sexually violent predator.  Iowa Code § 229A.7(5); *In re Det. of Pierce*, 748 N.W.2d 509, 512 (Iowa 2008).  A person is a sexually violent predator if the person (1) "has been convicted of a sexually violent offense"; (2) "suffers from a mental abnormality"; and (3) the mental abnormality makes the person "more likely than not to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility."  *Pierce*, 748 N.W.2d at 512; *see also* Iowa Code § 229A.2(15) (defining "sexually violent predator").  Sanders contests the State's proof of the second and third elements.

For the second element, Iowa Code section 229A.2(8) defines a "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity of a person and predisposing that person to commit sexually violent offenses to a degree which would constitute a

menace to the health and safety of others." "To prove such a condition exists, the State must show the respondent has 'a serious difficulty in controlling behavior.'" *In re Det. of McFadden*, No. 23-1935, 2024 WL 5153703, at *2 (Iowa Ct. App. Dec. 18, 2024) (quoting *In re Det. of Barnes*, 658 N.W.2d 98, 101 (Iowa 2003)).

Relying on his expert's opinion, Sanders claims that his condition did not affect his volitional capacity because "he had no other record of criminal offenses other than his sex offenses" and because he "did not act out in a violent manner in prison." Sanders points to Dr. Rosell's testimony that although Sanders had "problematic behavior" in the past, the behavior did not continue in prison, where "he basically interacted with males in a consensual manner."

Dr. Schmitt disagreed. He testified that Sanders has "had a problem controlling his impulses over the years. That's primarily come out in terms of his sexual offending in the community as well as his sexual activity in prison." Even though Sanders' sexual activity in prison was consensual, Dr. Schmitt stated "it's still breaking the rules. So that's how I still see it as a problem with him controlling his impulses." Dr. Schmitt explained that if volitional capacity is understood "to represent one's decision making and behaviors based on decisions," then "certainly, Mr. Sanders has shown he has made bad decisions, made bad choices, and acted on those both in the community and in prison creating victims and affecting those people and also affecting himself over and over again."

The district court agreed with Dr. Schmitt, finding that the record showed Sanders' "difficulties with self-control are often in the area of sexual behaviors." The court noted Sanders' "impulsiveness and limited self-control in his criminal offenses is . . . plainly evident," citing his statements

5

to the experts "that he did not plan to have sex with R.B. and that he just wanted to meet her, but that the interaction just progressed from talking to sex." With C.H., Sanders told Dr. Schmitt that the sexual contact "just happened" and that he "was not thinking." Summing up his behavior, Sanders said, "I just wanted to get my rocks off, honestly." He repeated that statement at the commitment hearing and explained, "I wanted to do what I wanted to do at the time."

"Because this issue essentially turned on a judgment of credibility between two experts with different opinions, we give weight to the district court's judgment." *In re Det. of Barnes*, 689 N.W.2d 455, 461 (Iowa 2004); *accord In re Det. of Stenzel*, 827 N.W.2d 690, 702 (Iowa 2013) (noting "that the fact finder was free to accept the testimony of the State's expert instead" of the respondent's in determining the mental abnormality question). That judgment is supported by substantial evidence in the record, including Sanders' own statements and his behavior before and during his incarceration.

Having found sufficient evidence of a mental abnormality, we turn to the third element: whether that condition made Sanders more likely than not to engage in predatory acts constituting sexually violent offenses if not confined. Sanders' challenge to this element fares no better, as it again depends on the district court's choice between conflicting expert opinions.

Dr. Schmitt used two actuarial assessments to calculate Sanders' risk of reoffending—the Static-99R and the VRS-SO. *See Pierce*, 748 N.W.2d at 513 ("An actuarial assessment provides an 'empirically measured rate of recidivism among a group of sex offenders who share a set of characteristics with the subject of the evaluation.'" (citation omitted)). He testified Sanders scored a 7 on the Static-99R, which examines "historical or static factors that

. . . don't change over time." That score placed Sanders in the "well above average" risk category—the highest category available under the instrument. Although Dr. Rosell scored Sanders one point lower on the same assessment, that score still landed him in the same risk category.

Under the VRS-SO, which Dr. Rosell did not use, Sanders scored in the "moderate" range of 36 out of 51. Dr. Schmitt testified the VRS-SO examines "changeable risk factors where people can get better, worse, or stay the same" and can be combined with the Static-99R to generate a "more comprehensive risk assessment." Based on these assessments, and using a multiplier to account for undetected offenses, Dr. Schmitt estimated Sanders' lifetime recidivism risk at 58 percent. From there, he concluded that Sanders' mental abnormality predisposed him to commit future sexually violent acts, exceeding the "more likely than not" threshold.

Dr. Rosell disagreed with Dr. Schmitt's use of extrapolation and multipliers to arrive at Sanders' lifetime risk assessment. He also gave more weight to Sanders' completion of sex offender treatment and his time in prison, explaining Sanders "had eight years to figure out that you cannot engage in sexual behavior with teenage girls, especially, that young." According to Dr. Rosell, Sanders is "a different person than when he was last in the community." But, as Dr. Schmitt testified, Sanders "had no access to kids or minors over the last eight years." *See In re Det. of Willis*, 691 N.W.2d 726, 729 (Iowa 2005) ("The absence of sexually predatory acts in a setting of secure confinement does not paint the same picture as the absence of such acts in a normal life situation."). Dr. Schmitt was also concerned with Sanders' lack of insight into the connection between his known "triggers"— alcohol, minors, pornography, and social media—and his sexual offenses.

Without that insight, Dr. Schmitt doubted Sanders' ability to manage those risk factors in the community.

The district court thoroughly addressed these concerns, emphasizing that regardless of their differences, both experts placed Sanders in the well above average risk category in their Static-99R score.

> Regarding the measures employed, there is no dispute that Sanders is in the well above average risk of recidivism category using the Static-99R. While the determination of whether use of the VRS-SO should be used is outside the Court's expertise, the factors identified by Dr. Schmitt as being of issue of Sanders certainly seem to be appropriate. Dr. Schmitt specifically noted that Sanders stated he acted out sexually to cope with negative feelings and that Sanders gravitated toward younger people to meet his intimacy needs. Dr. Schmitt also expressed concerns about Sanders's release plans based upon his observations of cognitive distortions and lack of insight. The Court agrees with Dr. Schmitt's opinions and shares his concerns.

> As a final matter regarding Sanders's likelihood of recidivism, he was asked by both experts what he believed his likelihood of committing a future sexual offense on a scale of zero to ten with zero being very low and ten being very high. With Dr. Rosell on February 2, 2024, Sanders stated zero and that he had realized his poor choices and learned about his risk factors. This self-rating was only a few weeks after he completed sexual offender treatment when presumedly, Sanders's insight would be at its peak. It is troubling to the Court that Sanders thought he was not at risk at all despite the knowledge he had gained from treatment about himself and his risk factors. Then, about a month later on February 29, 2024, Sanders rated his likelihood as a three to Dr. Schmitt. When Dr. Schmitt asked why not zero, Sanders responded that he wanted to attend Aftercare and stated he turns to alcohol when stressed. It is unclear what prompted this change in rating, but it suggests to the Court that Sanders's insight may be inconsistent and unreliable.

> The third element does not require conclusive evidence that Sanders will engage in future sexually violent offenses, just that there is a more-than-not likelihood that Sanders will engage in further acts of sexual violence. Having considered the actuarial measures, the opinions of the

experts, and Sanders's testimony, the Court finds beyond a reasonable doubt that Sanders's mental abnormality makes him more likely than not to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility.

This reasoning is sound and supported by substantial evidence. More than anything, it simply appears the district court found the testimony of Dr. Schmitt to be more persuasive. That was within the court's purview as the finder of fact. *See Stenzel*, 827 N.W.2d at 702; *see also State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (stating that it is the factfinder's role "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence" (citation omitted)). Upon viewing the record in the light most favorable to the State, we conclude substantial evidence supports the court's determination that Sanders was more likely than not to reoffend if released.

For these reasons, we affirm the district court's order finding that Sanders is a sexually violent predator.

**AFFIRMED.**