# IN THE SUPREME COURT OF IOWA

No. 11–0687

Filed March 1, 2013

IN RE THE DETENTION OF
JONATHAN EDWIN STENZEL

JONATHAN EDWIN STENZEL,

Appellant.

---

Appeal from the Iowa District Court for Linn County, Douglas S. Russell (motion to dismiss), Robert E. Sosalla (summary judgment), and Ian K. Thornhill (trial and order of commitment), Judges.

An individual committed as a sexually violent predator appeals the order of commitment. **DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR NEW TRIAL.**

Dean A. Stowers (until withdrawal), and then Nicholas A. Sarcone of Stowers Law Firm, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Linda J. Hines and John B. McCormally, Assistant Attorneys General, for appellee.

**MANSFIELD, Justice**.

This sexually violent predator (SVP) civil commitment proceeding presents three distinct issues. First, it requires us to determine whether the State may wait until the conclusion of a person's overall prison term to bring an SVP proceeding, when the person has received consecutive sentences for a sexually violent offense and for another offense, with the sentence for the other offense to be served after the sentence for the sexually violent offense. Second, we must decide whether sufficient evidence supports the jury's finding that the respondent here is an SVP. Finally, we must decide whether it was reversible error for the district court to permit the State's expert to testify at trial as to how the State uses its prosecutorial discretion to select the persons against whom it will commence SVP proceedings.

We conclude that a person serving consecutive sentences, one of which is for a sexually violent offense, is "presently confined" within the meaning of our civil commitment statute. *See* Iowa Code § 229A.4(1) (2009). Thus, an SVP petition is timely if it is filed before the respondent's anticipated release from prison, so long as the current term of imprisonment includes a sentence for a sexually violent offense. *Id.* In addition, we find sufficient evidence to support the jury's verdict that the respondent here was an SVP. Yet, we hold that it was error to admit expert testimony on the State's procedure for selecting persons against whom SVP proceedings are filed. For this reason, we reverse the judgment of the district court and remand for a new trial.

## I. Facts and Procedural Background.

Jonathan Stenzel has been incarcerated virtually his entire adult life. In 1981, when he was nineteen years old, he committed a burglary. He pled guilty and was sent to prison in 1982. The burglary, by Stenzel's

admission, arose out of an incident where he beat up a thirteen-year-old girl and ripped her blouse. Stenzel acknowledges that while in prison, he began having fantasies of rape.

In 1986, Stenzel was released from prison. Within a few months, Stenzel had entered a bookstore, pulled a knife on an elderly employee, and threatened to kill her if she didn't do what he asked. He then attempted to have intercourse with the employee and eventually forced her to perform oral sex on him. He left the store with her bra and said he would be coming back.

Before Stenzel had been apprehended for that crime, he broke into a house ten days later and set it on fire.

Ultimately, Stenzel was caught and charged with both crimes. He pled guilty to second-degree sexual abuse in connection with the bookstore rape, and first-degree burglary and second-degree arson in connection with the home burglary/arson.

On March 24, 1987, the district court imposed sentences of twenty-five years for the sexual abuse, twenty-five years for the burglary, and ten years for the arson. The burglary and arson sentences were to be served concurrently to each other and consecutive with the sexual abuse sentence. The department of corrections designated the sexual abuse offense as the "lead" offense. Using the longer of the two concurrent sentences, it calculated a tentative release date for Stenzel of May 1, 2010.

Stenzel served approximately the first ten years of his prison term at the state prison in Anamosa and did not receive any sex offender treatment there. In 1997, he was transferred to Mount Pleasant, where he participated in a Sex Offender Treatment Program. The program lasted approximately two years and involved a number of assignments

and activities. Stenzel generally received good marks for his behavior at Mount Pleasant. He worked at the prison library and participated in one-on-one sessions with female counselors without any significant disciplinary problems.[1]

While at Mount Pleasant, Stenzel claims he received in 1998 or 1999 a document from prison officials indicating that he had completed his sexual abuse sentence. The record does not contain such a document.

Following his time at Mount Pleasant, Stenzel was transferred to a voluntary program, the Interchange Freedom Initiative, housed at the Newton Correctional Facility. There, he participated in a Christian rehabilitation program and lived in an "honors dorm," where he could come and go freely and his room had an ordinary door instead of bars.

As Stenzel's release date was approaching, the State began the process for Stenzel's civil commitment. On April 6, 2010, the State filed a petition alleging Stenzel was a sexually violent predator under Iowa Code chapter 229A, Iowa's civil commitment statute. The State accompanied its petition with a "Statement of Probable Cause" detailing Stenzel's criminal history. The probable cause statement asserted that the 1986 sexual assault and the 1981 burglary were sexually motivated offenses. It also included the assessment of a forensic psychologist, Dr. Barry Leavitt, that Stenzel met the criteria for being classified a sexually violent predator. That day, the district court made a preliminary determination that probable cause existed to believe Stenzel was a sexually violent predator.

---

[1]Stenzel did acknowledge that he was disciplined for "borrowing" cassette tapes from a fellow inmate.

Stenzel filed a motion to dismiss on September 16. He argued that the State had not met its burden of showing either (1) that Stenzel had committed some "recent overt act" of sexual violence or (2) that he was presently confined. *See* Iowa Code § 229A.4(1)–(2). Specifically, Stenzel argued that, according to the department of corrections calculations, he had long ago completed his sentence for second-degree sexual abuse. Therefore, based on our decision in *In re Detention of Gonzales*, 658 N.W.2d 102 (Iowa 2003), Stenzel maintained he was no longer "confined." *See Gonzales*, 658 N.W.2d at 104 (stating that the "confinement" referenced in the statute "means confinement for a sexually violent offense").

On November 17, 2010, the district court denied Stenzel's motion to dismiss, reasoning that because of the consecutive nature of the sentences, "the defendant was still serving a sentence for a sexually violent offense" when the State filed its SVP petition. Stenzel then filed a motion to enlarge pursuant to Iowa Rule of Civil Procedure 1.904(2) which was also denied.

On January 18, 2011, Stenzel filed a motion for summary judgment. This was denied on the basis that Iowa Code section 901.8 controlled Stenzel's case and required that the court construe the consecutive sentences as "one continuous term of imprisonment." *See* Iowa Code § 901.8.

The matter proceeded to a jury trial where the State offered testimony from Stenzel and Dr. Leavitt. Stenzel had argued in his trial brief that Dr. Leavitt should not be permitted to testify as to (1) hearsay information relating to Stenzel's 1981 and 1986 offenses and (2) the process by which Stenzel was referred for SVP proceedings. On the stand, Dr. Leavitt offered his opinion that Stenzel suffered from

paraphilia, not otherwise specified (non-consent), as well as an antisocial personality disorder, and that Stenzel met the statutory criteria for a sexually violent predator. *See* Iowa Code § 229A.2(11) (" 'Sexually violent predator' means a person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility."). Dr. Leavitt testified he had interviewed Stenzel for approximately four-and-a-half hours and concluded that he had engaged in "minimization," or the downplaying of important elements of his behavior and crimes.

Dr. Leavitt also testified that he had performed three actuarial risk assessments concerning Stenzel. These procedures are designed to determine the risk of reoffending based on the historical recidivism percentages of offenders with certain scores. Stenzel placed in the high risk category on one of the assessments, in the moderate risk category on the second, and in the highest risk category on a third. Dr. Leavitt testified that these assessments actually underestimate the risk of future sexually violent crime, given that they only reflect reported incidents.

Two other aspects of Dr. Leavitt's testimony form part of the basis of this appeal. Dr. Leavitt based his conclusion that Stenzel was an SVP, in part, upon the rigorous selection process by which the State determines who should be committed in the first place.

> Q. Doctor Leavitt, the Directors' Review Committee begins at the prison with all sex offenders? A. That is correct.

> Q. They decide a case meets criteria, they refer it to where? A. They refer it to the Multidisciplinary Review Committee.

Q. And who makes up that committee? A. That would be made up of various people within—both within and outside of the Department of Corrections.

Q. Do they refer every case they get? A. No. It was my understanding that they review a very small percentage, a very small percentage of cases get referred for—to the next step.

That such a small percentage of people emerge from the screening process was a consideration in Dr. Leavitt's overall determination. He noted that "one of the considerations I look at is the fact that an individual has already . . . been deemed relatively high risk enough to have made it to this particular point in the process." Dr. Leavitt also briefly alluded to the fact that a court already has made an initial probable cause determination that Stenzel is a sexually violent predator.

Q. And then from there, a smaller number are referred to the Attorney General's Office? A. That would be correct.

Q. What happens next? A. At that point in time, there is—if the Court has found probable cause on a case—

The State later highlighted the selectivity of the process in its closing argument:

I want to start by just explaining a little bit about how we got here. We heard a little bit about this, but these are unusual cases. They don't come up all of the time. And there's a screening process that goes into this and it's pretty sensitive and not many people meet the criteria as a sexually violent predator.

The way it begins is that the Department of Corrections—they review every sex offender in the place. That goes through a process called the Directors' Review Committee and they look at the files of all the sex offenders and they decide if these people meet criteria or not.

Some of them—a small number get referred up to the next level, which is called the Multidisciplinary Team which is a group of . . . doctors, but also some social workers and some people with some other types of experiences. If they decide that a person meets criteria, then it gets referred to

an expert and in this case, we brought in Doctor Barry Leavitt.

. . . .

If Doctor Leavitt finds somebody meets criteria, that goes to another committee; the Prosecutors' Review Committee. Again, another screening process. And if that committee agrees, then somebody is recommended for SVP and then at that point, Doctor Leavitt goes out and does another evaluation—or whoever the expert is. In this case—in this case, it's Doctor Leavitt.

They do another evaluation. Sometimes they change their mind on that. In this case, at every step of the way, Mr. Stenzel has been considered to meet criteria for SVP, but what's really—what's important is what do you think? It's up to you.

Stenzel objected to testimony describing the selection process. He insisted that Dr. Leavitt's testimony regarding the selection process amounted to hearsay and was not a reasonable basis for Dr. Leavitt's opinion under Iowa Rule of Evidence 5.703. Stenzel further objected that it violated Iowa Rule of Evidence 5.403 and his own due process rights because "what [Dr. Leavitt]'s really doing is just saying because we're here, [Stenzel]'s high risk." The district court overruled the objections, but gave the jury a limiting instruction at that time:

These statements are not to be considered by you as proof of what is actually contained in the statements or for the truth of the matter asserted in there. The statements can only be considered by you in evaluating Doctor Leavitt's testimony, his opinions that he's giving as part of his testimony.[2]

---

[2]The jury was further instructed at the close of evidence as follows:

Throughout the testimony of the Petitioner's expert, Dr. Leavitt, he referred to sources he consulted in forming his opinion. These included various things including documents, reports and statements that persons other than Respondent had made. These documents, reports and statements were made out of court and not under oath. Those matters, as I am sure you know, are hearsay. The only reason they were received and allowed in the expert's testimony is because I have found that those are the type of subjects that may be relied upon by

In addition to offering testimony as to how individuals are selected for the SVP process, Dr. Leavitt testified that the 1981 burglary and the 1986 burglary/arson—not just the 1986 bookstore sexual abuse—were sexually motivated. Dr. Leavitt explained that the 1981 burglary included an element of sexual violence. He noted that charges were originally filed, then dropped, for assault with intent to commit sexual abuse. He pointed out that Stenzel attempted to bite the thirteen-year-old's breast once inside the house. Dr. Leavitt also testified that Stenzel admitted later that there may have been a sexual component to the 1981 incident. In his trial testimony, though, Stenzel said he could not recall biting the girl's breast or whether other charges had been filed.

Over Stenzel's objection, Dr. Leavitt also used the minutes of testimony to amplify on Stenzel's 1986 burglary and arson convictions. He informed the jury that Stenzel took women's clothing with him when he left the house. He noted that Stenzel had also inserted a steak knife into a picture of one of the little girls in the family. In addition, according to the minutes, Stenzel had left a meat cleaver and another knife on a waterbed. All this, according to Dr. Leavitt "had elements of sexual deviance to it."

Moreover, Dr. Leavitt added details about the sexual assault in the bookstore. He noted that Stenzel had been reading a book titled *Rape* in the store before he attacked the elderly woman with a knife as she was trying to close up for the day.

_____

an expert in forming opinions of the kind that he testified to you about. Those matters are to be used by you, not as proof of what is contained in them. Those matters may be used by you only in evaluating Dr. Leavitt's testimony and the opinions that he gave and in determining whether or not those opinions have validity.

Stenzel called several witnesses in his defense. One was a former acquaintance of Stenzel in prison. This individual had been released and owned a business in Colorado. He testified that he wanted to hire Stenzel to work for him. Another witness was the former librarian at the Newton Correctional Facility. She testified that Stenzel worked for her "a very long time," did what he was asked to do, was "very respectful," and was "not ever aggressive." She also testified that students from Grinnell (primarily female) would come in to teach the inmates and she "did not ever see Jon interact inappropriately with any person."

A female correctional officer at Newton testified that she interacted with Stenzel for about ten or eleven years and never observed him to be a violent person. He was "very helpful," "[a]lways willing to do anything that anyone asked," and "peaceful, mellow, got along with the other offenders." He was someone that she enjoyed talking to, and he never acted in a way toward anyone that would be considered sexually inappropriate.

At the close of the evidence, the jury returned a verdict finding that Stenzel was a sexually violent predator. Stenzel now appeals.

On appeal, Stenzel argues: (1) the district court erred in denying his motions to dismiss and for summary judgment, because the State brought this SVP proceeding too late—i.e., years after Stenzel had completed his sentence for second-degree sexual abuse; (2) the jury's finding that Stenzel was a sexually violent predator was not supported by substantial evidence; and (3) the district court erred in admitting Dr. Leavitt's testimony describing the civil commitment selection process and the background to Stenzel's crimes that came from the minutes of testimony or from sources other than the convictions themselves and Stenzel's own admissions.

## II. Standard of Review.

We review the district court's ruling on a motion to dismiss for errors at law. *Geisler v. City Council of Cedar Falls*, 769 N.W.2d 162, 165 (Iowa 2009). Likewise, rulings on summary judgment motions are reviewed for errors at law. *Keokuk Junction Ry. v. IES Indus., Inc.*, 618 N.W.2d 352, 355 (Iowa 2000); *see also* Iowa R. App. P. 6.907.

Although we generally review the district court's admission of hearsay evidence for errors at law, "when the basis for admission of hearsay evidence is the expert opinion rule, which provides no hard and fast rule regarding admissibility, we will employ an abuse of discretion standard." *Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 5 (Iowa 2001). Under this standard, we reverse only if the district court exercised its discretion on clearly untenable or unreasonable grounds. *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* (quoting *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000)).

## III. Legal Analysis.

**A. Was the Proceeding Timely Commenced?** Section 229A.4 of the Iowa Code governs the State's petition for civil commitment. Section 229A.4 "plots two separate courses for the civil commitment of a sexually violent predator." *In re Det. of Shaffer*, 769 N.W.2d 169, 173 (Iowa 2009). In the first course, the State may only seek civil commitment of a person who has committed a recent overt act. Iowa Code § 229A.4(2). Commitment of a nonconfined person absent a "recent overt act" showing would "raise serious constitutional issues." *Gonzales*, 658 N.W.2d at 105.

The second course is the subject of this appeal. Section 229A.4(1) applies to persons who are presently confined:

> If it appears that a person presently confined may be a sexually violent predator and the prosecutor's review committee has determined that the person meets the definition of a sexually violent predator, the attorney general may file a petition alleging that the person is a sexually violent predator and stating sufficient facts to support such an allegation.

Iowa Code § 229A.4(1). This section does not require the State to allege a recent overt act; it is only necessary that the person be presently confined.

Our inquiry must begin with chapter 229A's plain meaning, if one exists. *Carolan v. Hill,* 553 N.W.2d 882, 887 (Iowa 1996) ("Precise, unambiguous language will be given its plain and rational meaning in light of the subject matter."). At first blush, the State's petition would appear to be timely because Stenzel was then incarcerated at the Newton Correctional Facility.

However, in *Gonzales,* we held that the State could not bring an SVP petition against an individual who had been convicted of indecent contact with a child, released from prison, and then sentenced to prison for operating a motor vehicle without the owner's consent. 658 N.W.2d at 102. As we explained, "confinement" as used in the statute "means confinement for a sexually violent offense." *Id.* at 104. We adopted this interpretation for a number of reasons:

> (1) [I]n each of the statutes, "confinement" and "sexually violent offense" or "sexually violent predator" appear in the same sentence; (2) by interpreting the statute as the State urges us (applying the "confined person" basis for commitment) the State would be relieved of showing a "recent overt act" . . . ; and (3) the result would not be a reasonable application of the statute because it would allow the State to reach back in time, seize on a sexually violent

> offense for which a defendant was discharged, and couple this with a present confinement for a totally different—or even perhaps a trivial—offense and use chapter 229A to confine the person. Iowa Code section 4.4 provides that, in construing a statute, "it is presumed that . . . [a] just and reasonable result is intended." The result urged by the State would not be just nor reasonable.

*Id.* at 104–05. We added that allowing the State to commit people confined for a nonsexual offense without a recent overt act would raise constitutional concerns, and we construed the statute to avoid such concerns. *Id.* at 105.

Since *Gonzales* was decided, we have held that the presently confined inquiry is not a hypertechnical one. *Shaffer*, 769 N.W.2d at 174. In *Shaffer*, the question was whether a person was presently confined under chapter 229A if his sexual abuse sentence had actually expired and, as a result, he was unlawfully imprisoned at the time the State sought civil commitment. *Id.* at 175. Declining to adopt a "hypertechnical definition of the phrase 'presently confined,'" we held that the person was confined, even if an improper calculation of earned time had led to an improper sentence. *Id.* at 174.

We noted in *Shaffer* that "[t]here is no doubt Shaffer was imprisoned at the Anamosa State Penitentiary in the custody of the department of corrections . . . when the State filed the petition for civil commitment." *Id.* at 173. "Moreover, the State never relied on any legal basis to justify his custody other than his sexual abuse conviction." *Id.* at 174.

The question we must now answer is whether the State may bring an SVP petition against an individual who has been continuously confined on a term of imprisonment that *includes* a sentence for a sexually violent offense, so long as the State brings the petition before

the person's prison term expires. We believe it can. To begin with, such a person is presently confined. *See* Iowa Code § 229A.4(1). While *Gonzales* qualified the meaning of that language in the case of a person who had been released from prison after serving the sentence for his sexually violent offense and was now being incarcerated for something else, the present circumstances are different. Stenzel's sentence for sexual abuse is part of his current prison term.[3]

Indeed, if we adopted Stenzel's position here, we would get what we tried to avoid in *Gonzales*, a result that "would not be just or reasonable." 658 N.W.2d at 105; *see also* Iowa Code § 4.4(3). Under Stenzel's reading of the statute, whether the State could wait until the conclusion of Stenzel's prison term to bring an SVP petition would depend on an essentially ministerial matter, namely, "Which of the consecutive sentences went first?" Also, if the first installment of the inmate's sentence were for the sexually violent offense, as here, the State would have to file an SVP petition years before the inmate's anticipated discharge. This is highly illogical. It would seem much fairer to both parties for the SVP determination to be made at the point when the inmate would otherwise be released, not when he or she still has years of imprisonment to serve and his or her psychological profile and behavior could change. It is noteworthy that in this case, Stenzel was able to present evidence of his good behavior when interacting with women during the latter years of his imprisonment after he had been transferred to Newton. That evidence would not have been available to him had this

---

[3]In *Gonzales*, we interpreted 229A.4(1) to require present confinement for a sexually violent offense, because otherwise the State could "reach back in time, [and] seize on a sexually violent offense for which a defendant *was discharged*." 658 N.W.2d at 105 (emphasis added). Stenzel was not discharged; he remained in prison on a term arising in part from a sexual abuse conviction.

SVP proceeding gone to trial at the expiration of the sexual abuse "portion" of Stenzel's sentence.

Stenzel's reading of the statute also appears to be at odds with Iowa Code section 229A.3(1). This provision states in part:

> When it appears that a person who is confined may meet the definition of a sexually violent predator, the agency with jurisdiction shall give written notice to the attorney general and the multidisciplinary team established in subsection 4, no later than ninety days prior to any of the following events:
>
> *a.* The anticipated *discharge* of a person who has been convicted of a sexually violent offense from total confinement
> . . . .

Iowa Code § 229A.3(1)(*a*) (emphasis added). In other words, section 229A.3 contemplates that the first steps in the SVP process that precede the filing of a petition may occur no later than ninety days before the discharge of a person from prison. This tying of the process to the anticipated discharge date would make no sense, however, if the petition in some instances had to be filed while an inmate was in the middle of his or her prison term. *See State v. Adams*, 810 N.W.2d 365, 369 (Iowa 2012) (indicating that we must "construe the statute in its entirety").[4]

As we have already pointed out, chapter 229A establishes an either–or proposition. Either the State must establish a recent overt act of sexually violent behavior, Iowa Code § 229A.4(2), or it must show that the individual is presently confined. *Id.* § 229A.4(1). *See Huss*, 688

---

[4]We have held that written notice to the attorney general under section 229A.3 is not a mandatory prerequisite to the filing of a petition under section 229A.4(1). *See In re Det. of Willis*, 691 N.W.2d 726, 728 (Iowa 2005) (stating that "a failure to give the statutory notice at least ninety days prior to anticipated discharge does not invalidate the proceedings later taken on the attorney general's petition filed pursuant to section 229A.4(1)"); *In re Det. of Huss*, 688 N.W.2d 58, 63 (Iowa 2004). Yet, at the same time, it remains true that the statute generally contemplates a two-stage process, the second stage of which would presumably occur after the first stage.

N.W.2d at 65 (noting that "under section 229A.4(1) the offense leading to the current confinement may be a substitute for the requirement of showing a recent overt act if it was a sexually violent offense"). In *In re Detention of Willis*, we explained why it was constitutional not to require a recent overt act for an individual who was presently confined:

> Determining whether a past act of sexual violence has become too stale to serve as a predictor of future acts of a similar nature is not a precise task. The significance of a recent overt act in predicting future conduct is not the act but the inference against a particular propensity that arises from the absence of an overt act. The absence of sexually predatory acts in a setting of secure confinement does not paint the same picture as the absence of such acts in a normal life situation. We have generally upheld the statutory scheme presented by Iowa Code chapter 229A against substantive due process challenges. *See In re Detention of Garren*, 620 N.W.2d 275, 282–83 (Iowa 2000). We reach a similar conclusion when focusing specifically on Willis's contention that a failure to require a showing of a recent overt act other than the act for which he was imprisoned violates substantive due process.

> . . . In not expressly requiring a recent overt act for petitions for commitment filed under section 229A.4(1), the legislature could reasonably conclude that the filing of a civil commitment petition must necessarily be delayed during the period of confinement under a criminal judgment and therefore allow a petition to be filed at the conclusion of that confinement notwithstanding the absence of an additional overt act.

*In re Det. of Willis*, 691 N.W.2d 726, 729–30 (Iowa 2005). Allowing the State to bring the SVP petition at the end of a prison term that includes a sentence for a sexually violent offense is consistent with this analysis. Regardless of the portion of the sentence that the inmate may be technically serving, he or she is still in "secure confinement," thus limiting the opportunity to commit "sexually predatory acts." *See id.* at 729. Therefore, it is reasonable for the State to bring its petition "at the conclusion of that confinement." *Id.* at 730.

Furthermore, Iowa Code section 901.8 provides:

> If a person is sentenced for two or more separate offenses, the sentencing judge may order the second or further sentence to begin at the expiration of the first or succeeding sentence. . . . [I]f consecutive sentences are specified in the order of commitment, *the several terms shall be construed as one continuous term of imprisonment.*

Iowa Code § 901.8 (emphasis added). In denying Stenzel's summary judgment motion, the district court correctly noted that we have applied this statute in other contexts. In *State v. Patterson,* a defendant received two consecutive terms of imprisonment of less than a year each but more than a year long when added together. 586 N.W.2d 83, 83 (Iowa 1998). We held that the defendant had been "sentenced to confinement for a period of more than one year," for purposes of determining whether he should be held in county jail or turned over to the custody of the department of corrections under Iowa Code section 903.4 if his probation were revoked. *Patterson,* 586 N.W.2d at 84. In *Thompson v. State,* we held that section 901.8 requires consecutive sentences to be treated as one continuous term for calculating disciplinary detention. 524 N.W.2d 160, 162–63 (Iowa 1994).

Stenzel argues that "the purpose of [section] 901.8 is to preserve order and discipline within the state's penal institutions." Applying section 901.8 here, he contends, would not serve that purpose. Yet we do not think section 901.8's purpose is so narrow. In *Patterson,* the consecutive sentences had been suspended. 586 N.W.2d at 84. Thus, the underlying question in *Patterson* was not one of order and discipline but administrative logic and consistency. Similarly, in *State v. Kapell,* we held that section 901.8 forbid the court from sentencing a defendant to a five-day term in county jail followed by a two-year prison sentence. 510 N.W.2d 878, 880 (Iowa 1994). *Kapell* does not appear to be a decision

about order and discipline but ease of administration. The same administrative considerations are present here. As we have pointed out above, it would not be administratively sound for the State to have to bring an SVP proceeding against a defendant who has over a decade still to serve in prison simply because the sexually violent offense was first in the sequence of consecutive prison sentences.

A decision from Washington is also on point. *See Fair v. State*, 161 P.3d 466, 470 (Wash. Ct. App. 2007), *aff'd sub nom. In re Det. of Fair*, 219 P.3d 89 (Wash. 2009). The Washington Court of Appeals considered whether due process required the State to prove a recent overt act when a person's sexually-violent-offense sentence had previously ended but he remained in custody for a robbery conviction. *Id.* at 469. Although *Fair* primarily involves due process issues, the reasoning is helpful here, especially given that our *Gonzales* interpretation of section 229A.4(1) was intended in large part to respond to constitutional concerns:

> While . . . Fair's sentence for the sexual offense had expired before the State filed its SVP petition, this difference is not relevant. Fair was in continuous confinement from the time he returned to prison on the second degree child molestation conviction until his scheduled release date on the first degree robbery conviction. He was not released into the community between the incarceration for the sexually violent offense and the robbery sentence and, thus, he had no opportunity to commit a ROA [recent overt act] in the community. Requiring proof of a ROA under these circumstances would be absurd.

*Fair*, 161 P.3d at 470. On appeal, the Washington Supreme Court agreed with the appellate court. *See Fair*, 219 P.3d at 94 (noting that requiring the State to show a recent overt act when a person has been "continuously incarcerated for child molestation and other nonsexual crimes" would be "contrary to the statute and our due process jurisprudence").

We accordingly affirm the district court's denial of Stenzel's motions to dismiss and for summary judgment, and hold that an SVP civil commitment respondent is presently confined when, at the time the State files its petition, he or she has been continuously incarcerated on a term that includes a sentence for a sexually violent offense.

**B. Was There Substantial Evidence to Support the Jury's Finding that Stenzel Was a Sexually Violent Predator?** Stenzel also argues that his commitment is not supported by sufficient evidence. If the jury's determination is not supported by substantial evidence, we must reverse the order of commitment. *See In re Det. of Hennings*, 744 N.W.2d 333, 340 (Iowa 2008).

Here the jury needed to find beyond a reasonable doubt that Stenzel had a mental abnormality causing him serious difficulty controlling his behavior. *See* Iowa Code §§ 229A.2(11), .7(5)(a); *see also In re Det. of Barnes*, 689 N.W.2d 455, 458 (Iowa 2004). It also needed to find beyond a reasonable doubt that Stenzel was more likely than not to commit a sexually violent offense in the future, absent confinement. *See* Iowa Code § 229A.2(4). In conducting our sufficiency review, we must consider all evidence admitted during trial, including evidence that may have been admitted erroneously.

> The rationale for doing this is based on the reliance by the State upon the trial court's decision to admit the evidence and the possibility that the State would have been able to introduce other evidence if error would have been found at trial, or otherwise employed different tactics to avoid a dismissal.

*State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

We believe substantial evidence supports the verdict here. At trial, the State presented statistical, clinical, and anecdotal evidence—some in Stenzel's own words—from which a reasonable jury could conclude that

Stenzel suffered from an abnormality causing serious difficulty controlling behavior that made it more likely than not he would reoffend.

Dr. Leavitt testified that he diagnosed Stenzel with paraphilia, not otherwise specified, (non-consent), as well as antisocial personality disorder. He based his conclusion on his recent interview of Stenzel and an examination of the details of his prior crimes. Dr. Leavitt also considered possible mitigating factors, such as Stenzel's treatment, his behavior, and his time in prison. As related by Dr. Leavitt, Stenzel sexually assaulted a bookstore employee at knifepoint in 1986; he attempted to bite a girl's breast during the 1981 burglary; and he stabbed a girl's photograph, took women's clothing, and left a meat cleaver and another knife on a waterbed during the 1986 arson/burglary. Stenzel himself admitted to having sexually violent fantasies in prison, although he testified he no longer does. He also admitted, "I still struggle with wanting to respond aggressively in situations." Dr. Leavitt concluded, "I believe . . . that [Stenzel] continues to remain vulnerable to the very impulses and urges that he had maintained and developed over the course of multiple years of his lifetime . . . [H]e maintains a continued vulnerability to those rape fantasies and urges." Dr. Leavitt also agreed with the antisocial personality diagnosis that Stenzel had been given in prison mental health evaluations. He said that this is an "added risk factor" for controlling his behavior.

Stenzel argues that Dr. Leavitt's testimony, on its own, did not establish he has a mental abnormality causing him serious difficulty controlling his behavior. Yet we have held that a diagnosis of an antisocial personality disorder affecting a respondent's ability to control behavior—a diagnosis Dr. Leavitt made here—can support a jury finding

that someone is a sexually violent predator. *In re Det. of Altman*, 723 N.W.2d 181, 185–86 (Iowa 2006); *see also Barnes*, 689 N.W.2d at 461 (finding sufficient evidence that respondent "had a serious difficulty controlling his behavior" where the State's expert found he had antisocial personality disorder as well as a high score on a psychopathy checklist). Stenzel also argues the jury could not reasonably have made such a finding when Stenzel presented witnesses who testified that he could control his behavior in prison. The jury was not required, however, to find that evidence conclusive as to how Stenzel would act if released from incarceration. In *Altman* and *Barnes*, the respondents offered contrary expert testimony, but we held that the fact finder was free to accept the testimony of the State's expert instead. *Altman*, 723 N.W.2d at 185; *Barnes*, 689 N.W.2d at 461. Although Stenzel's lay witnesses offered testimony in favor of his position, Dr. Leavitt supported his assessment with an interview and other factors. Some aspects of Stenzel's own testimony supported the State's case. In short, the State presented sufficient evidence that Stenzel suffered from a mental abnormality and had serious difficulty controlling his behavior. *See Hennings*, 744 N.W.2d at 340 ("Evidence is substantial if a jury could reasonably infer a fact from the evidence.").

Dr. Leavitt also concluded that Stenzel was more likely than not to commit a sexually violent offense in the future, if not confined. *See* Iowa Code § 229A.2(11). Dr. Leavitt relied on three actuarial risk tools. *See In re Det. of Pierce,* 748 N.W.2d 509, 513–14 (Iowa 2008) (discussing actuarial risk assessments and stating that they "were relevant to determine whether Pierce is an SVP within the meaning of the Act"). On the Static-99R, which examines ten risk factors, Stenzel scored a six. This score placed him in the high risk category, meaning he had a

recidivism rate of "2.9 times higher than the recidivism rate of the typical sex offender." According to Dr. Leavitt, people in that risk category have a recidivism rate of between 17.4 to 32.7% in five years, and 23 to 42.8% in ten years. *Cf. id.* (explaining that the respondent was in the high risk category on the same instrument which was associated with a fifty-two percent rate of reconviction over a period of fifteen years).

On the Static-2002R, a fourteen-factor assessment, Stenzel scored a six, placing him in the moderate risk category. People in this category have between a 5.4 and a 22% recidivism rate over five years, and between a 28.2 and a 31.1% recidivism rate over ten years. However, Dr. Leavitt explained that these statistics do not account for the "20 to 30-some percent" who committed a future sexually violent offense but were not "detected."

Finally, on the Minnesota Sex Offenders Screening Tool—Revised, a sixteen-factor test, Stenzel scored a fourteen. According to Dr. Leavitt, seventy-two percent of offenders with results above thirteen were arrested for committing a sexually violent offense within six years of their release. *See id.* at 514 (discussing the same figures).

Dr. Leavitt used these assessments, coupled with his clinical judgment of Stenzel's particular circumstances—specifics of his crimes, treatment, and response to treatment—to conclude that Stenzel "continues to be more likely than not to reoffend at some time in the future with a future sexually violent offense." Stenzel did not call an expert who had reached a different conclusion. Stenzel did present supportive testimony from lay witnesses. Nonetheless, reviewing the record, we are convinced there was substantial evidence from which the jury could find that Stenzel was a sexually violent predator within the meaning of the statute. *See* Iowa Code § 229A.2(11).

Stenzel points out on appeal that Dr. Leavitt conceded the actuarial tests have a positive correlation of 0.6. Thus, according to Stenzel's interpretation, "it would seem that these instruments only get it right slightly more than half the time." Stenzel also urges that even according to Dr. Leavitt, only one of the tests showed more than a fifty percent likelihood of Stenzel's reoffending. However, Dr. Leavitt's testimony was extensive, and it was based upon both the actuarial instruments and his individualized evaluation of Stenzel. It was for the jury to decide whether or not to accept his opinion. *See Altman*, 723 N.W.2d at 185 (holding there was substantial evidence to support the jury's finding that the respondent was a sexually violent predator in the face of the respondent's contrary expert testimony, because " '[i]t was for the jury to decide which of the experts was more credible . . . and whose opinion . . . the jury would accept' " (citation omitted)).

Stenzel further argues that Dr. Leavitt's risk assessments were improperly inflated because Dr. Leavitt relied on inadmissible evidence concerning the SVP commitment process and the 1981 and 1986 crimes. As previously noted, though, we consider even improperly admitted evidence for purposes of a sufficiency review. *See Dullard*, 668 N.W.2d at 597. Accordingly, we affirm the denial of Stenzel's motion for a directed verdict and now turn to the evidentiary issues.

**C. Was It Proper to Admit Expert Testimony About the State's Selection Process for Civil Commitments and About the Respondent's Criminal Case Files?** Stenzel argues the district court improperly allowed Dr. Leavitt to testify about (1) the process used by the State to decide which inmates will become the subject of SVP proceedings and (2) material (such as minutes of testimony) found in Stenzel's criminal case files. Stenzel maintains Dr. Leavitt's testimony on

these subjects was hearsay and not a proper basis for expert opinion under Iowa Rule of Evidence 5.703. Stenzel also asserts it was unfairly prejudicial under rule 5.403.[5] The State responds that Dr. Leavitt confirmed other experts in the field rely on both categories of information. *See* Iowa R. Evid. 5.703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). The State adds that Dr. Leavitt's testimony in these areas was more probative than prejudicial.[6]

1. *Dr. Leavitt's testimony regarding the civil commitment selection process.* Early in his testimony, Dr. Leavitt was asked to explain the process of civil commitment in Iowa. He then informed the jury that out of the universe of sex offenders due to be released, "some" are referred by the directors' review committee to the multidisciplinary team, and of those only "a very small percentage" are in turn referred to the attorney general's office. He testified that "multiple independent evaluators" are used. When the case reaches the attorney general's office, Dr. Leavitt might be asked to serve as a preliminary independent evaluator. If so, and if he finds the individual meets the SVP criteria, he would present

---

[5]In addition, Stenzel insists that Dr. Leavitt's testimony about the selection process violated his due process rights. The State contends that this argument was not preserved below. In light of our disposition of this appeal, we need not reach the due process argument.

[6]The State argues Stenzel did not preserve error on his rule 5.403 argument as it relates to Leavitt's testimony that the earlier convictions were sexually related. The State notes that Stenzel "did not lodge an objection pursuant to rule 5.403 prior to Dr. Leavitt's testimony about whether his other convictions were sexually related." However, immediately after Dr. Leavitt testified—unprompted, initially—that the 1986 burglary was sexually related, Stenzel objected "for the reasons we previously discussed," which included rule 5.403 objections. Likewise, Stenzel offered the "same objection" before Dr. Leavitt answered a question calling for the "basis" of the 1981 charge for assault with intent to commit sexual abuse.

his findings to a review committee which would then decide whether to file an SVP petition. On occasions in the past, the attorney general has not filed an SVP petition even though the independent evaluator concluded the individual met the statutory criteria.

Out of the presence of the jury, Dr. Leavitt admitted he relied on this winnowing process in part to support his opinion that Stenzel fell into a high risk category. However, he was not able to quantify the percentage of inmates who are screened out. Dr. Leavitt indicated that his source of information was "discussions with various personnel in the process."[7]

Having presented testimony through Dr. Leavitt about the screening process, the State highlighted it in closing argument, where it was essentially the first topic covered. The State's counsel argued to the jury that there is "a screening process that goes into this and it's pretty sensitive and not many people meet the criteria as a sexually violent predator." After recapping that screening process, counsel concluded, "In this case, at every step of the way, Mr. Stenzel has been considered to meet criteria for SVP, but what's really—what's important is what do you think?"

Our rules of evidence provide that an expert may base his or her opinion on evidence that is not otherwise admissible. *See* Iowa R. Evid. 5.703; *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 182 (Iowa 2004) ("If the trial judge determines the hearsay is 'reasonably relied upon' by

---

[7]As the State notes, Stenzel's counsel did not initially object to each question about the screening process. However, following one of his objections, there was a lengthy session outside the presence of the jury that included voir dire of Dr. Leavitt and extensive argument of counsel. Following that session, the district court indicated that Dr. Leavitt would be allowed to testify about the process. The State concedes on appeal that Stenzel preserved error on his rule 5.703 and rule 5.403 objections to testimony about the screening process.

experts as required by the rule, the court has discretion to admit the underlying hearsay evidence." (citation omitted)). But rule 5.703 is intended to give experts appropriate latitude to conduct their work, not to enable parties to shoehorn otherwise inadmissible evidence into the case. Thus, in *Gacke*, we rejected hearsay evidence as a basis of expert opinion in a nuisance case against a hog farm. 684 N.W.2d at 181–84. The experts based their opinion on questionnaires filled out by people who experienced problems with the odor emanating from the farm. *Id.* at 183. This was impermissible, we held, because the questionnaires were used to show more than the factual basis of the experts' opinions.

> [T]he questionnaires addressed matters that went far beyond the documentation of odors and breathing problems upon which the experts relied. Individuals completing the questionnaires not only described the odor they experienced, but also answered questions asking for their "opinion as to the origin of the odor," as well as "any other information concerning . . . the persons responsible that [the responding individuals thought] might be important."

*Id.*

Likewise, in *State v. Vincik*, we held that the district court did not abuse its discretion in declining to admit an expert's testimony concerning what he had been told by other persons regarding a criminal defendant's mood before allegedly killing his wife. 398 N.W.2d 788, 795 (Iowa 1987). The expert opined that the defendant could not recall events surrounding his wife's killing, an opinion he based in part on out-of-court statements from the defendant's friends and neighbors. *Vincik*, 398 N.W.2d at 788. We upheld the district court's refusal to admit the basis of the expert's opinion because "this record does not show that psychologists ordinarily or reasonably rely upon such information." *Id.* at 796.

We conclude the district court abused its discretion in admitting Dr. Leavitt's testimony about the selection process for several reasons. First, there was no evidence that psychologists *generally* rely on the existence of a government-run screening process when they make a diagnosis of sexual deviancy. All Dr. Leavitt said was that psychologists doing this particular forensic assignment for SVP proceedings rely on that process. This is not enough. Rule 5.703 requires that the facts and data be viewed as reasonably reliable by experts in "the particular field." We believe "particular field" means the group of people who possess the relevant "scientific, technical, or other specialized knowledge," *see* Iowa R. Evid. 5.702, not the more narrow category of people who regularly testify for a given side as experts in a given kind of case.

Second, rule 5.703 is limited to "facts or data" that could be "reasonably relied upon." Dr. Leavitt's knowledge of the selection process fell short of that. With respect to the initial screening, Dr. Leavitt said, "It is my understanding that there was a screening process," but he added, "I am not privy to the exact mechanism involved." He claimed that only a "very small percentage of cases" advance to the attorney general's office for potential filing but he could not give actual figures; and what he could say was based on discussions with unnamed "various personnel." Moreover, as Stenzel notes, Dr. Leavitt participated in that screening process. His own opinions were part of the reason that Stenzel continued through it. Rule 5.703 was not intended to be a mechanism for experts to self-bolster their own opinions. *See Brunner v. Brown*, 480 N.W.2d 33, 35 (Iowa 1992) ("If the underlying evidence is furnished by a biased witness, it probably will be excluded."); *see also State v. Barrett*, 445 N.W.2d 749, 751 (Iowa 1989) ("[Rule 5.703] does not empower one expert witness to state other experts also subscribe to the witness's

stated conclusion."). And an expert's own testimony regarding reasonable reliance is not conclusive, "being only one factor in the consideration." *Brunner*, 480 N.W.2d at 35.

Third, and perhaps most important, rule 5.403 can override rule 5.703. If the probative value of allowing the expert to testify to underlying facts and data "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," the evidence should be excluded. *See* Iowa R. Evid. 5.403.

> We employ a two-part test to decide whether evidence should be excluded under rule 5.403. First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact.

*State v. Huston*, __ N.W.2d __, __ (Iowa 2013) (citations and internal quotation marks omitted).

Here the jury has to make a very important prediction about the future that is necessarily fraught with some uncertainty—does an offender "suffer[] from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility"? *See* Iowa Code § 229A.2(11). In making that decision, it would undoubtedly give jurors comfort to be told—as Stenzel's counsel put it—that the State has "weaned out all of the people who shouldn't be subject to the process and gotten down to just a few."

The prosecutor's closing argument serves as a useful barometer of the prejudicial character of the evidence. Right off the bat, the State told the jury that "not many people meet the criteria as a sexually violent predator." The State then reviewed the hoops that Stenzel's case had to get through. Finally, the State wrapped up this portion of its closing

argument by asking, "In this case, at every step of the way, Mr. Stenzel has been considered to meet criteria for SVP, but what's really—what's important is what do you think?" One might regard that compound statement/question as an artful attempt at reverse psychology.

This aspect of the trial strikes us as lacking in probative value and unfairly prejudicial to the respondent. We would not allow the State in a criminal case to offer evidence that the district court had to approve the trial information, thereby determining that there was probable cause to detain the defendant to answer the charge. *See State v. Petersen*, 678 N.W.2d 611, 614 (Iowa 2004). Nor would we allow a county attorney's office to show that it prosecutes only a percentage of the cases referred to it, or that it brings cases only after an internal review has found sufficient evidence for a jury to conclude the defendant is guilty beyond a reasonable doubt.

We recently held in a child endangerment case that rule 5.403 barred the admission of a department of human services finding that the defendant had committed child abuse, explaining:

> We see no probative value to the DHS determination the abuse report against Huston was founded. Whether or not the abuse report was deemed founded is irrelevant to any issue for the jury to decide. Additionally, we see a real danger the jury will be unfairly influenced by that agency finding, which gives the "imprimatur" of a purportedly unbiased state agency on a conclusion that Huston was guilty of child abuse.

*Huston*, __ N.W.2d at __. A similar principle should apply here. It is for the jury to decide whether Stenzel meets the definition of an SVP. Introducing evidence that a lengthy selection process, including representatives inside and outside the department of corrections, picked out Stenzel to be one of the few candidates for SVP status presents a

"real danger the jury will be unfairly influenced" by a purportedly unbiased "imprimatur." *Id.*

We believe an SVP case from Kansas supports this view. *In re Care & Treatment of Foster*, 127 P.3d 277, 286 (Kan. 2006). In that case, without objection, the civil commitment selection process was described by the State in opening statement, by an expert for the State in his testimony, and by the State in closing argument. *Id.* at 280–82. For example, the State advised the jury in its opening statement that "this respondent . . . has been through many layers of review and analyses until we finally get here, and that's the ultimate determination for you to make." *Id.* at 283 (emphasis omitted). An expert for the State testified that the multidisciplinary team does a "review of the information and make[s] a determination whether they see the person as a high risk to offend." *Id.* at 281. The State then reiterated at closing argument that "this man has gone through many levels of reviews." *Id.* at 282 (emphasis omitted).

Without even reaching the expert testimony and the closing argument, the Kansas Supreme Court found the improper opening statement alone warranted a new trial, noting:

> Stated simply, we see no reason whatsoever, even in a noncriminal proceeding, why the State's attorney—or the State's evidence—need mention the levels of review of the case that occurred before it was brought to this jury. More important, we conclude that these statements by the State, and this type of State evidence, "stack the deck" against Foster.

*Id.* at 286. The undue prejudice in such circumstances is significant because "a jury has a natural tendency to look for guidance from those clothed in authority, i.e., a multidisciplinary team of professionals, a team of prosecutors, and a district court judge, even when the guidance

is not intended." *Id.* When the State highlights such details, it also has the effect of commenting on the credibility of the State's own witness or injecting the prosecutor's own opinion into the trial. *Id.* Finally, the court noted that the State's reference to an earlier probable cause determination by a court—something Dr. Leavitt briefly alluded to—was "the most troubling aspect of the opening statement." *Id.* at 287. The court noted:

> Because the result a judge supposedly desires may be inferred by the jury from a look, a lifted eyebrow, or an inflection of the voice to the extent a new trial is warranted, *a fortiori* an attorney's reference to a judge's *prior decision* supporting the attorney's case can certainly influence a jury to the extent that reversal is required.

*Id.*

We agree with these observations on the unfair and improper influence created when the State and its expert comment on the details of the civil commitment selection process. Although the present appeal concerns the admission of evidence, whereas *Foster* was a prosecutorial misconduct case, the endpoint is the same: the introduction of such unfairly prejudicial information to the jury requires a new trial.

It is true that the district court gave limiting instructions. But a limiting instruction may not be enough, *State v. Henderson*, 696 N.W.2d 5, 12 (Iowa 2005), and we find it was not enough here. *See also Huston*, __ N.W.2d at __ ("We do not believe it would have been proper in this case to allow testimony that the child abuse report was determined to be founded even with a limiting instruction."). In closing argument, the State clearly sought to drive home the point that Stenzel was one of a few sex offenders that the State had selected, following a lengthy process, for SVP proceedings. "Although a statement may be purportedly offered for a non-hearsay purpose, the district court must still determine if the

party's true purpose in offering the evidence was in fact to prove the statement's truth." *McElroy v. State*, 637 N.W.2d 488, 501–02 (Iowa 2001). Notably, the State does not tell us why Dr. Leavitt's testimony concerning the selection process was needed; it asserts only that Dr. Leavitt's references to that process were "minimal" and there was sufficient foundation for his testimony.

We only find reversible error when the admission of improper evidence affects a party's substantial rights. *Gacke*, 684 N.W.2d at 183. "The admission of hearsay evidence 'is presumed to be prejudicial error unless the contrary is affirmatively established.'" *Id.* (quoting *Frunzar v. Allied Prop. & Cas. Ins. Co.*, 548 N.W.2d 880, 887 (Iowa 1996)). The State has not affirmatively established that testimony on the selection process did not tip the balance here. Although Stenzel certainly had committed at least one violent sexual offense in the past, he had spent the last twenty-three years in prison, had undergone sex offender treatment, and had passed a relatively uneventful decade at Newton, which resulted in two female officials from that prison testifying at trial on his behalf. Furthermore, only one of Stenzel's three actuarial test scores (the Minnesota Sex Offenders Screening Tool—Revised) directly translated into a projected recidivism rate of greater than fifty percent. Additionally, as Stenzel has demonstrated, that high score depended upon the 1981 burglary being classified as sexually related. That was a matter of some contention at trial, as we further discuss below.

Accordingly, because of the improper admission of testimony regarding the selection process, we must reverse and remand for a new trial. *See Gacke*, 684 N.W.2d at 185 ("[T]he Gackes have failed to rebut the presumption of prejudice flowing from the improper admission of this evidence. Therefore, we reverse and remand for a new trial.").

2. *Dr. Leavitt's testimony detailing Stenzel's 1981 and 1986 offenses.* Stenzel also contends the district court committed reversible error in allowing Dr. Leavitt to testify about certain "criminal history records" relating to his past offenses. Because we have already determined that a retrial is required, we will address this issue. It is likely to arise again on remand. *See State v. Dudley*, 766 N.W.2d 606, 615 (Iowa 2009) (addressing "the other issues in this appeal that are likely to arise upon remand").

At trial, Dr. Leavitt testified his opinions were based in part upon some of the facts surrounding Stenzel's 1981 and 1986 offenses. He testified that he learned this information from

> Comprehensive records from the Iowa Department of Corrections, various criminal history records, presentence investigation reports, police and/or investigative reports, disciplinary reports, treatment records from the Department of Corrections, and I believe minutes of testimony from his previous and most current criminal offense . . . convictions.

Asked whether these were the type of records commonly relied upon by forensic psychologists, Dr. Leavitt testified, "Yes, they are."

Accordingly, on the stand, Dr. Leavitt filled in numerous details. He pointed out that, after the 1981 home invasion, Stenzel initially had also been charged with assault with intent to commit sexual abuse. He testified that Stenzel broke into the neighbor's house with a handgun and attacked the thirteen-year-old girl "both physically and sexually." In addition, Dr. Leavitt described Stenzel having read a book on rape in the bookstore in 1986 before sexually assaulting the elderly employee. Dr. Leavitt also explained that the 1986 burglary/arson had elements of "sexual deviance" in that Stenzel had put a knife in a photo of a girl, had taken women's clothing from the house, and had left a meat cleaver and knife on a waterbed.

Although some of these particulars were apparently acknowledged by Stenzel when Dr. Leavitt interviewed him, others came from the minutes of testimony. Minutes of testimony contain "a full and fair statement of the witness' expected testimony." Iowa R. Crim. P. 2.5(3). So Dr. Leavitt seems to have based his opinion that Stenzel was a sexually violent predator, at least in part, on material summarizing testimony the State expected at trial. Dr. Leavitt agreed that the minutes were "the best record we have of those events."

Other state courts have explored the extent to which experts in SVP proceedings can testify about the respondent's past offenses beyond what the convictions, the plea proceedings (if there was a plea), and the trial records (if there was a trial) divulge. These decisions have reached varying outcomes. For instance, a recent Virginia case considered expert testimony regarding details of unadjudicated sexual misconduct in an SVP civil commitment proceeding. *Lawrence v. Commonwealth*, 689 S.E.2d 748, 750 (Va. 2010). There, an expert witness diagnosed an alleged sexually violent predator with paraphilia and based this conclusion on incidents that did not result in formal charges. *Id.* Specifically, the expert relied on a police report, which included "alleged victims and witnesses [who] were in some cases not identified and none [of whom] were available for cross-examination." *Id.* at 752. The Virginia Supreme Court concluded, based on Virginia's rules of evidence, that the trial court abused its discretion in admitting the basis of testimony, despite a limiting instruction like the one here, because it "improperly included numerous details about unproven past allegations of sexual misconduct against Lawrence." *Id.* at 752. The court noted that, although the standard of review was for abuse of discretion, the trial court did not have discretion to admit clearly inadmissible evidence. *Id.*

at 751; *see also Commonwealth v. Wynn*, 671 S.E.2d 137, 141 (Va. 2009) (reaching a similar result).

The New Jersey Supreme Court, on the other hand, endorsed the use of presentence reports as a basis for expert testimony in SVP civil commitment proceedings. *In re Civil Commitment of J.M.B.*, 964 A.2d 752, 772 n.9 (N.J. 2009). The Washington Supreme Court has permitted expert testimony based on "police reports, legal records, treatment records, juvenile records, psychological and psychiatric evaluations, and medical records." *In re Det. of Marshall v. State*, 125 P.3d 111, 113 (Wash. 2005). That case did not specify whether "legal records" included minutes of testimony or their equivalent.

The Nebraska Supreme Court seems to have struck a balance by requiring that criminal history records bear some "indicia of reliability" in order to serve as the basis for expert opinion in SVP cases. *In re A.M.*, 797 N.W.2d 233, 261 (Neb. 2011). That court found that due process required the records to have some independent reliability apart from the expert's reliance on them. *Id.* at 261–62. One such indicator is whether the defendant pled guilty to the crimes to which the records relate. *Id.* at 261; *see also In re Commitment of Williams*, 841 So. 2d 531, 531–32 (Fla. Dist. Ct. App. 2003) (holding that experts could refer to facts in police reports in an SVP proceeding, but distinguishing the situation where neither criminal charges had been brought nor a conviction obtained based on those reports), *overruled on other grounds by In re Commitment of DeBolt*, 19 So. 3d 335, 338 (Fla. Dist. Ct. App. 2009). In *A.M.*, the court remanded for the tribunal to determine whether certain police reports bore sufficient indicia of reliability. 797 N.W.2d at 261–62.

After considering these authorities, we believe it was improper for Dr. Leavitt to testify in an SVP proceeding about the existence of a

criminal charge that was dropped, and that it was also potentially improper for him to testify from the minutes of testimony. Both of these items are prepared by the prosecutor for prosecution purposes. *See* Iowa R. Crim. P. 2.5(1), (3). The trial information is a statement of what the prosecution expected (at one point) to prove; the minutes are a statement of what the prosecution expected witnesses to testify. Whether we consider these from the standpoint that they are not truly "facts or data," *see* Iowa R. Evid. 5.703, or from the standpoint that the danger of unfair prejudice substantially outweighs their probative value, *see id.* r. 5.403, we question the basic fairness of the State's using materials that it generated exclusively to prosecute Stenzel criminally as a factual ground for committing him as an SVP at the conclusion of his sentence. We believe a prophylactic rule against expert testimony on these matters is an appropriate interpretation of our rules of evidence.

In appropriate circumstances, an expert may testify about facts learned from other records, although the defendant may raise case-specific objections under rule 5.703, rule 5.403, or any other applicable rule of evidence. Additionally, Stenzel's own admissions, whether in the form of a plea, a statement in court, or a statement to Dr. Leavitt, are not hearsay and do not raise the same level of concern, either.

The record in this case does not clearly disclose the source of Dr. Leavitt's knowledge for all the statements he made concerning Stenzel's 1981 and 1986 offenses. On remand, we ask the district court to apply the principles we have set forth here.

### IV. Conclusion.

Based on the foregoing, we hold that the State brought this proceeding against Stenzel in a timely fashion and that Stenzel's motions to dismiss and for summary judgment were properly denied. We also

conclude the evidence presented below was sufficient to support the jury's finding that Stenzel was a sexually violent predator and that Stenzel's directed verdict motion was correctly overruled. However, we find that the State's expert should not have been permitted to testify about the winnowing process by which the State selects certain violent sex offenders for SVP commitment proceedings. We therefore reverse the judgment of the district court and remand for a new trial. At the new trial, the district court should also reconsider the admissibility of expert testimony about the specifics of Stenzel's prior offenses in light of the discussion in the preceding section.[8]

**DISTRICT COURT ORDER AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR NEW TRIAL.**

---

[8]Stenzel also argued on appeal that the district court should have given certain jury instructions requested by him. We believe our resolution of this appeal moots that argument and renders it unnecessary for us to reach it.