# IN THE COURT OF APPEALS OF IOWA

No. 13-1137
Filed August 13, 2014

**IN RE THE DETENTION OF
CLYDE HOLLINS,**
      Applicant-Appellee,

**STATE OF IOWA,**
      Petitioner-Appellant.

_____

      Appeal from the Iowa District Court for Des Moines County, Michael J. Schilling, Judge.


      The State appeals the district court's order denying its request for supervised release of Clyde Hollins, a sexually violent predator found to be suitable for discharge from the civil commitment program.  **AFFIRMED.**


      Thomas J. Miller, Attorney General, and John McCormally, Assistant Attorney General, for appellant.

      Michael Adams, Local Public Defender, and Amy Kepes, Assistant Public Defender, for appellee.


      Considered by Vaitheswaran, P.J., and Bower and McDonald, JJ.  Tabor, J., takes no part.

**BOWER, J.**

The State appeals the district court's order denying its request for supervised release of Clyde Hollins, a sexually violent predator found to be suitable for discharge from the civil commitment program. *See* Iowa Code § 229A.9A (2013). The State contends the district court abused its discretion in failing to order release with supervision. Finding no abuse of discretion in discharging Hollins from the program and no provision in Iowa law for his supervision once discharged, we affirm.

**I. Background Facts and Proceedings.**

Starting in March 1975, seventeen-year-old Hollins committed eight sexual assaults in a ten-year period. In September 1990, Hollins was convicted of two counts of third-degree sexual abuse and sentenced to serve an indeterminate term of incarceration not to exceed thirty years. *In re Det. of Hollins*, No. 04-1829, 2006 WL 623523, at *1 (Iowa Ct. App. Mar. 15, 2006). Prior to his scheduled release in August 2004, the State "filed a petition requesting Hollins's commitment as a sexually violent predator." *Id.* At his civil commitment trial, Hollins was found "to be 'a sexually violent predator' [(SVP),[1] and] the court placed him in the custody of the Iowa Department of Human Services [(DHS)] for confinement in a secure facility." *Id.* at *3. Hollins appealed, and we affirmed. *Id.* at *7.

---

[1] A "sexually violent predator" is a person who "[(1)] has been convicted of or charged with a sexually violent offense and [(2)] suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility." Iowa Code § 229A.2(11). The State was required to prove both elements in order to show Hollins was subject to commitment. *See In re Det. of Blaise*, 830 N.W.2d 310, 318 (Iowa 2013).

At the time of his 2004 commitment, Hollins was diagnosed with two mental abnormalities,[2] anti-social personality disorder and paraphilia not otherwise specified. After his commitment, Hollins resided at the civil commitment unit for sex offenders (CCUSO). The statutory scheme of chapter 229A establishes a goal of treatment services:

> If the court or jury determines . . . the respondent is a [SVP], the respondent shall be committed to the custody of the [DHS] for control, care, and *treatment* until such time as the person's mental abnormality has so changed that the person is safe to be placed in a transitional release program or discharged.

Iowa Code § 229A.7(5)(b) (emphasis added).

In 2009, Hollins was placed in the transitional release facility at CCUSO. Within a few months, Hollins was removed from this facility.[3] We note Dr. Thomas of CCUSO testified the 2009 incident is not relevant to the issues now reviewed.

---

[2] "[M]ental abnormality" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity of a person and predisposing that person to commit sexually violent offenses to a degree which would constitute a menace to the health and safety of others." Iowa Code § 229A.2(5). "Both the definition of 'mental abnormality' and the definition of 'sexually violent predator' are focused on the likelihood that the respondent will commit a sexual offense." *In re Det. of Altman*, 723 N.W.2d 181, 185 (Iowa 2006).

[3] The district court found the CCUSO director had filed a motion requesting the court remove Hollins from his first transitional release due to alleged violations of the transitional release agreement. The court also found, before the matter could be heard, the State moved to dismiss its motion, stating: "In the twelve months since his return to confinement, [Hollins] has successfully completed specific treatment goals identified by the CCUSO staff. CCUSO staff now believes that Mr. Hollins should be given another opportunity for transitional release." Based on this history, the court concluded: "In view of this recommendation, no final violation hearing was ever held and no finding was ever made that [Hollins] violated any condition of transitional release."

After Hollins successfully completed treatment goals, in 2011 he was again placed in the transitional release facility. Hollins's 2012 annual report[4] filed in December 2011 and prepared by Dr. Thomas of CCUSO, stated Hollins had made progress over the last several years and he no longer suffered from paraphilia. Dr. Thomas testified and explained the transitional program:

> Patients who are in transitional release have the opportunity to have more independence, more access to the community, and they are expected to really guide their treatment with some more independence.
> So patients in transition will have the opportunity to get a driver's license, get a vehicle, get a job in the community. They will start traveling with staff escorts into the community for things like shopping or AA appointments, and then gradually once they've done well in those trips into the community, start traveling independently back and forth to shopping or to work.

Dr. Thomas's next annual report on Hollins, filed on March 5, 2013, opined Hollins's antisocial personality disorder had abated. She concluded, to a reasonable degree of medical certainty, Hollins no longer suffers from a mental abnormality making him more likely than not to reoffend.

The next month, Hollins filed a petition for discharge and request for hearing regarding annual review. In July 2013, the district court held a final hearing, at which the State had the burden "to prove beyond a reasonable doubt" that Hollins's "mental abnormality remains such that [he] is likely to engage in predatory acts that constitute sexually violent offenses if discharged." Iowa Code § 229A.8(6)(d)(1).

---

[4] Iowa Code section 229A.8(2) provides: "A person committed . . . shall have a current examination of the person's mental abnormality made once every year."

At the time of the hearing, fifty-six-year-old Hollins had been in the transitional release program for twenty-six months. During that time, Hollins had no "reports of incident," had obtained employment at Tyson Foods in Storm Lake, had bid on and was selected for a promotion at Tyson Foods, had prepaid three months of rent on an apartment, and had saved $30,000. Independently, Hollins travelled to work in Storm Lake from CCUSO in Cherokee without incident. Hollins also went shopping, exercised, and participated in treatment without direct supervision.

At the final hearing the State requested, if it had not met its burden of proof, the court order DHS to release with supervision under Iowa Code section 229A.9A(1)(b). Hollins requested a "direct discharge."

The court heard the testimony of Hollins, Dr. Thomas of CCUSO, forensic psychologist Dr. Rosell, and K.K., a woman Hollins sexually assaulted in 1989. Both doctors testified Hollins did not suffer from a mental abnormality such that he was more likely to engage in predatory acts that constitute sexually violent offenses if discharged from CCUSO. Thus, Hollins no longer met the criteria for civil commitment. But, the doctors disagreed on whether release with supervision was warranted—the proverbial battle of the experts.

At the end of the testimony, Hollins moved for a directed verdict, and the court and the parties discussed the statutory language in section 229A.9A(1)(b), which states the court "may order the committed person released with or without supervision if" the court "has determined that the person should be discharged from the *program*, but the court has determined it is in the best interest of the

community to order release with or without supervision before the committed person is discharged." (Emphasis added.) The parties agreed the word "program" referred to the CCUSO program. *See id.* § 229A.9A(1)(b).

The court recognized the next statutory section stated, when a court orders a release "with or without supervision," the DHS has thirty days to prepare a release plan.[5] *Id.* § 229A.9A(2). The State emphasized that a person released "with or without supervision" from the CCUSO program "is not discharged from being civilly committed until ordered by the court at a subsequent proceeding" after successful "completion of the release program."[6]

The court told the parties it would enter an order discharging Hollins from the CCUSO program and "he can go live at the apartment." The court also stated it would resolve by a separate order whether Hollins is discharged from commitment: "I don't believe it's appropriate if I discharge him from the program to continue to make him live at CCUSO while I decide the issue of whether he's discharged from commitment in its entirety." The State objected: "[I]f the court is going to go ahead and discharge him from the program today and he can go live in the apartment as of tomorrow, I think it becomes difficult to reestablish supervision over him."

---

[5] The release plan addresses "the person's needs for counseling, medication, community support services, residential services, vocational services, alcohol or other drug abuse treatment, sex offender treatment, or any other treatment or supervision necessary." Iowa Code § 229A.9A(2).

[6] Iowa Code section 229A.9A(6) states: "A committed person released with or without supervision is not considered discharged from civil commitment." Iowa Code section 229A.9A(7) states: "After being released with or without supervision, the person may petition the court for discharge."

The court's "order for discharge from program," filed on the morning of July 8, 2013, retained jurisdiction to rule "in the near future" upon the State's "request that the court order Hollins released with supervision before he is discharged from commitment." The court ordered Hollins "be discharged from CCUSO."

Following this order, the State e-mailed an "emergency motion for stay pending court's order on release with supervision" to the court. The motion stated it "is uncertain how to proceed with physical custody of Mr. Hollins while the court decides the supervision issue." On the afternoon of July 8, the court denied the State's motion for stay and also ruled: "[T]he request made by the State of Iowa to order [Hollins] released with supervision . . . or in the alternative released without supervision is DENIED."

The State appeals and does not challenge the court's conclusion Hollins should be released from the program, admitting "the evidence both from the CCUSO evaluator and Dr. Rosell[7] was that [Hollins] no longer meets the statutory criteria of being 'more likely than not' to reoffend." On appeal, the State claims the court abused its discretion in ordering an "unconditional release" instead of a release with supervision.

**II. Standard of Review.**

The parties dispute the applicable standard of review. Commitment proceedings under chapter 229A are civil in nature. *In re Det. of Garren*, 620

---

[7] Dr. Rosell opined he would not have diagnosed Hollins with paraphilia not otherwise specified at any time, past or present, because he does not believe it is an official diagnosis—it is not in the DSM-V.

N.W.2d 275, 283 (Iowa 2000); *see also* Iowa Code § 229A.1 (recognizing the need for a civil commitment procedure for the long-term care and treatment of SVPs).

Hollins claims this court should review the district court's decision "for an abuse of discretion." The State agrees "chapter 229A vests discretion with the district court for a determination of whether release with supervision is appropriate following a determination a [SVP] should be discharged from the program." However, the State claims our review *should be* "de novo to the extent of examining all the evidence to determine whether the court abused that discretion in denying the State's request for supervision." In support of its proposed standard of review, the State cites two juvenile court cases, proceedings that are non-civil and are generally reviewed de novo: *State v. Tesch*, 704 N.W.2d 440, 447 (Iowa 2005) and *In re Matzen*, 305 N.W.2d 479, 482 (Iowa 1981). The *Tesch* court cited *Matzen* and explained:

> We generally review court rulings in juvenile proceedings de novo. *See In re Interest of Henderson*, 199 N.W.2d 111, 116 (Iowa 1972) (stating because juvenile proceedings are neither criminal nor civil, they are special proceedings subject to de novo review). Nonetheless, where the legislature has clearly vested the juvenile court with discretion in a specific area, we review the court's decision on that matter for an abuse of discretion. *See In re Interest of Matzen*, 305 N.W.2d 479, 482 (Iowa 1981) (considering juvenile court's statutory discretion to enter a consent decree). Our review *remains de novo* only in the sense that we examine "all the evidence to determine whether the court abused that discretion." *State v. Greiman*, 344 N.W.2d 249, 251 (Iowa 1984) (reviewing juvenile court's waiver ruling).

704 N.W.2d at 447 (emphasis added).

We are not persuaded by the State's authorities. First, the State cites no authority, from this State or any other, using its *proposed* standard in

circumstances similar to the circumstances herein. Second, as the above quotation shows, juvenile proceedings are not civil or criminal and are generally reviewed de novo. Thus, juvenile cases are clearly distinguishable from *civil* commitment cases. *See also In re Det. of Geltz*, 840 N.W.2d 273, 274 (Iowa 2013) (holding we review the district court's construction of chapter 229A for the correction of errors at law and a juvenile adjudication of delinquency cannot serve as a predicate conviction to adjudicate the offender a SVP under the civil commitment statute).

It is undisputed that our supreme court has not explicitly adopted the standard of review urged by the State. In the absence of a clear direction to employ such a standard, we will review for an abuse of discretion. Under an abuse of discretion standard, "we reverse only if the district court exercised its discretion on clearly untenable or unreasonable grounds." *In re Det. of Stenzel*, 827 N.W.2d 690, 697 (Iowa 2013). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* (quoting *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010)).

**III. Discussion.**

The State raises one issue: whether the district court abused its discretion in declining the State's request that Hollins be released with supervision and subject to a release plan under section 229A.9A upon his discharge from the CCUSO program. Iowa Code section 229A.9A(1)(b) states:

In any proceeding under section 229A.8,[8] the court may order the committed person released with or without supervision if . . . [t]he court . . . has determined that the person should be discharged from the program, but the court has determined it is in the best interest of the community to order release with or without supervision before the committed person is discharged.

At the 2013 hearing, Dr. Thomas testified she joined CCUSO in September 2011 "primarily to conduct the annual evaluations." She also testified she spent five hours with Hollins as she created his 2012 and 2013 annual reports and Hollins "has done very well" during his second transitional release. She acknowledged that since 2004, Hollins has had his victim pool—adult women—available to him. Further:

> Q. [I]n your interview, you asked Mr. Hollins if he sees himself as a risk at all for committing future sex offenses; correct? A. Yes.
> Q. And do you recall his response? A. . . . I believe my question was a . . . zero to ten scale, and he had said a "one" with the rationale that essentially anybody with a history and that has done these things in the past has to acknowledge that they have some chance in the future of re-engaging in those activities.

Dr. Thomas opined it is in the best interest of the community "for Mr. Hollins to be supervised." As to "why," she explained:

> A. I think that any time you have an offender having additional supervision it's going to increase public safety and having supervision and/or additional treatment is going to serve to reduce the chance that they reoffend.
> . . . .
> Q. Now, you were asked if additional supervision would increase public safety, and you said, yes? A. Correct.
> Q. Wouldn't it always increase public safety? A. It would.

---

[8] Section 229A.8(1) states civil commitment continues unless "facts exist to warrant a hearing to determine whether a committed person no longer suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses if discharged." *See Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 313 (Iowa 2013).

Q.  Wouldn't we all be safer if Mr. Hollins and those in his position are supervised forever?  A.  Yes.

Dr. Rosell testified, after spending ten years working in a Maryland prison's sex offender program, he worked as the sex offender treatment director for the Mount Pleasant, Iowa correctional facility from 1998 until 2002.  He then entered private practice.  Dr. Rosell testified he has known Hollins since Hollins was involved in sex offender treatment in 2000 or 2001 at Mt. Pleasant.  Hollins stood out to Dr. Rosell from the hundreds of offenders—"I was aware of his criminal history, which was pretty significant.  But he was involved in treatment.  He was doing really well.  He was very interested in treatment.  So he was trying to do his best at that time."

After he left Mt. Pleasant for private practice, Dr. Rosell observed changes in Hollins:

Q.  In the time that you have known Mr. Hollins, how has he changed?  A.  . . . First of all, I was asked in [2004] to determine if he was an SVP, and I evaluated him and I found that he was.  And that's why I wasn't in that case because I . . . wasn't favorable for the attorney who hired me . . . .  [Hollins] always had this underlying anger . . . .

And then since that time, he has changed immensely . . . . [H]e had changed significantly in [2009] when I was here and saw him testify, and I interviewed him before he testified.

The more I see him, the more he continues to change, and not just talking the talk . . . he also does the work.

Twenty-six months in the community, no problems, making money, access to do whatever he wants . . . .  [H]e could have easily left Iowa if he wanted to, but he chose not to.  He chose to work a twelve-hour day, go back to CCUSO, spend the night, go back to work.  I mean, while still going to groups, going to AA, helping other people, getting help from other people when he needed it.

. . . [T]he record shows . . . how well he's done.  If he still has this underlying anger, it's not being expressed in any untoward

manner . . . and I think that's important . . . . And I think he is genuine when he talks about the harm he has done to others.

So in those ways . . . this is a very unique situation. It's not often that I come in and testify for an individual who actually has been in the community back and forth and is following all the rules . . . . It's over two years of doing the right thing. And why would he not continue to do the right thing? [It] would be absurd for him to then all of a sudden start doing the wrong thing, just because he's no longer supervised. I think [he has] done well under this supervision period.

Dr. Rosell specifically opined supervision of Hollins would not "really make that much of a difference." Also:

The community would feel a little better, but . . . I'm of the opinion that if an individual wants to do something, they're going to do it. And he has had the opportunity to do something, and he didn't.

If he didn't have such a good record, then it would be different. I often recommend supervision for individuals who I'm not as comfortable with . . . [b]ut that's not Mr. Hollins. Not everybody is the same.

So I think he has demonstrated responsibility. I mean, he already has an apartment paid for, for three months. That's taking responsibility. That's just trying to keep progressing . . . . [I]n this case, I don't think he needs [supervision].

Section 229A.9A provides the district court with the discretion to release committed persons unconditionally, as was done here, or with or without supervision, either of which makes the person subject to a release plan and to continuing civil commitment until another, separate hearing. The district court's ruling shows the court concluded Dr. Rosell's testimony was more credible and more responsive to the particular circumstances of Hollins's case.

Generally, we defer to a district court's assessment of conflicting expert witnesses because that court is in a better position to judge the credibility of witnesses. *See In re Det. of Barnes*, 689 N.W.2d 455, 461 (Iowa 2004)

("Because the issue essentially turned on a judgment of credibility of two experts with different opinions, we give weight to the district court's judgment."); *State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) ("When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses."); *State v. Fetters*, 562 N.W.2d 770, 775 (Iowa Ct. App. 1997) ("When the psychiatric testimony is conflicting, the reviewing court will not determine anew the weight to be given trial testimony.").

The expert opinion testimony of Drs. Thomas and Rosell was in conflict, and the district court certainly could have accepted Dr. Thomas's evidence—it chose not to.  We do not interfere with such decisions, and even though this court may have come to a different conclusion, we give deference to the district court and will only overturn its ruling for an abuse of discretion.  We note Dr. Rosell undisputedly was more familiar with Hollins and his circumstances for much longer periods of time—years versus hours for Dr. Thomas.  We find that once the court's order of July 8, 2013 was filed, discharging Hollins from the program, the question of whether he should have been supervised or not became moot.  Finding no abuse of discretion, we affirm.

**AFFIRMED.**